SLIP OPINION

Cite as 2017 Ark. 115

# SUPREME COURT OF ARKANSAS

No. CV–16–1018

| | |
|---|---|
| BRANDON MARTIN<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES<br><br>AND<br><br>B.D., J.M., AND A.M., MINORS<br>APPELLEES | Opinion Delivered: April 6, 2017<br><br>APPEAL FROM THE LAWRENCE COUNTY CIRCUIT COURT<br>[NO. JV-2014-97]<br><br>HONORABLE KEVIN KING, JUDGE<br><br>AFFIRMED; COURT OF APPEALS OPINION VACATED. |

**JOHN DAN KEMP, Chief Justice**

Appellant Brandon Martin appeals an order of the Lawrence County Circuit Court terminating his parental rights to his three children, B.D., J.M., and A.M., pursuant to Arkansas Code Annotated section 9-27-341 (Supp. 2013).[1] For reversal, Brandon contends that the circuit court erred in finding (1) that appellee Arkansas Department of Human Services (DHS) proved the grounds alleged in the petition by clear and convincing evidence and (2) that termination was in the best interest of the children. He further contends that the termination decision must be reversed because it was based on a mistake of fact that the juveniles had been adjudicated dependent-neglected as a result of abuse. We affirm.

---

[1] The children's mother, Megan Martin, consented to the termination of her parental rights. She is not a party to this appeal. To avoid confusion, we will refer to the Martins by their first names.



## I. *Factual and Procedural Background*

On October 20, 2014, DHS filed a petition for emergency custody of B.D., born March 23, 2012, and J.M., born December 26, 2013. A seventy-two-hour hold was taken on both children on October 17, 2014, after the Martins had taken J.M. to the hospital on October 16 based on concerns about an injury to his left leg. According to affidavits, the Martins sought treatment for J.M. at Le Bonheur Hospital, where it was determined that J.M. had suffered a traverse fracture to the left femur. A report was made to the child-abuse hotline for suspected physical abuse because explanations for the broken bone were inconsistent and unconvincing. An investigator learned that J.M. had a two-year-old sibling, B.D., and went to the grandparents' home where B.D. was staying. While there, the investigator discovered that B.D.'s feet had been burned. The investigator observed "thickly wrapped gauze" on B.D.'s feet and noted that the gauze was yellowish and had a strong odor emanating from it. The investigator also observed that B.D. began to cry in pain when her grandfather attempted to unwrap her feet. Meanwhile, Megan and Brandon appeared at the grandparents' home, and Megan claimed that B.D.'s feet were burned because she had been sitting in front of a space heater for too long. Megan said that she put B.D. in cold water to cool her feet off; then, she put gel on B.D.'s feet and wrapped them. The investigator noted that B.D. had "red, peeling, burnt skin going all the way around her feet and up to her ankles," that the "bottom of her big toes did not have any skin at all," and that the "sides of her feet were also peeling." The investigator believed the burns were caused by immersion. B.D. also had bruising on her face, back, and left side, a knot on the top left side of her forehead, and scratches on her neck and arms. B.D. was transferred to

Arkansas Children's Hospital, where she underwent surgery for the injuries to her feet. An ex parte order for emergency custody and a probable-cause order were entered on October 21.

On November 13, 2014, DHS filed a petition for emergency custody and dependency-neglect for A.M., who was born on November 7, 2014, based on the alleged physical abuse to B.D. and J.M. An ex parte order for emergency custody of A.M. was entered on November 17, and a probable-cause order was entered on November 18.

Following continuances, an adjudication hearing was held on February 10, 2015. In the adjudication order,[2] the circuit court accepted the Martins' stipulation that B.D., by a preponderance of the evidence, was a dependent-neglected child because of inadequate supervision by the parents. The circuit court found that J.M. and A.M. were also dependent-neglected juveniles based on their sibling's status as a dependent-neglected juvenile. The Martins were given supervised visitation with B.D. and J.M. once per week for one hour and supervised visitation with A.M. once per month for one hour. The circuit court found that DHS had made reasonable efforts to prevent the removal of the children. The goal of the case was reunification.

A review hearing was held on May 12, 2015. The goal of the case continued to be reunification, and the circuit court found that DHS had made reasonable efforts to provide family services. The circuit court permitted Brandon to have unsupervised visitation with the children every other weekend but prohibited Brandon from allowing Megan to have contact with the children during his visitation.

---

[2] The adjudication order was not filed until August 27, 2015.

On May 15, DHS filed an emergency motion to modify visitation and requested that Brandon's visitation be restricted to weekly supervised visits. In the motion, DHS alleged that, on May 12, Brandon had been given unsupervised visitation based on his testimony that he and Megan were separated and that he would not allow Megan to have contact with the children, but the Martins were seen together in Brandon's car on May 14. DHS further alleged, "Brandon and Megan Martin continue to have contact. Any appearance of separation is solely for the purpose [of] Mr. Martin being in a better position to regain custody of the children." DHS requested that Brandon's visitation be restricted to weekly supervised visits. Brandon responded and admitted that he continued to have contact with Megan, but he stated that he would not allow contact between Megan and his children at any time while he was exercising visitation.

On August 17, 2015, DHS filed a petition to terminate the Martins' parental rights and alleged multiple grounds against each parent, including the failure-to-remedy ground; failure-to-provide-significant-support-ground; adjudicated-as-a-result-of-abuse-that-could-endanger-the-child's-life ground; subsequent-factors ground; substantial-period-of-incarceration-ground; and the aggravated-circumstances ground. *See* Ark. Code Ann. §§ 9-27-341(b)(3)(B)(i)*(a)*, (ii)*(a)*, (vi)*(a)*; (vii)*(a)*, and (ix)*(a)(3)*. DHS alleged that Megan had been charged with a felony for causing B.D.'s injuries and that the case was still pending; that Brandon had failed to separate himself from Megan; that Brandon had been given the opportunity to have unsupervised visitation with his children, but that opportunity ceased when he continued to have contact with Megan; and that he had chosen his children's abuser over his children. Brandon responded and denied that DHS had established any

ground for termination. Specifically, he denied that DHS had made meaningful efforts to rehabilitate and correct the conditions that caused removal. He denied that he had failed to separate himself from Megan, and he denied that his choosing Megan over the children prevented placement with him.

On January 19, 2016, the circuit court held a termination hearing. Brandon testified that his divorce from Megan had been finalized "a couple of hours" before the hearing. When asked why it had taken so long to obtain a divorce, Brandon testified that he wanted to see what happened in the termination proceedings and in the criminal proceedings against Megan. Brandon stated that, at first, he did not think that Megan had caused the children's injuries, but because the court had found her guilty, he believed Megan had harmed the children. Later, he changed his testimony and said that he still did not know whether Megan had harmed the children. He said that he did not go to court for Megan's plea, that he did not know whether she had admitted guilt, that he did not know the length of Megan's sentence to prison, and that he did not know her expected release date. Brandon acknowledged that Megan was the only adult present when B.D.'s injuries occurred, but when he was asked whether Megan had burned B.D.'s feet, he answered that he honestly did not know. Brandon testified that he had listened to medical testimony about B.D.'s burns, but he could not remember what was said. He also testified that he could not remember if he had asked how J.M.'s leg had been broken.

Brandon testified that his mother would assist him with the children if they were returned to him. He acknowledged that his mother was not present at the termination hearing, although she had been at the divorce hearing earlier that day. Brandon stated that

if his mother could not help him, his sister would, but he admitted that he had not been to his sister's house in over a year. He testified that he had called Kidsney Zone and some other daycare centers, but he had nothing set up yet for the children "because they had to fill the positions." Brandon said that he remembered signing a case plan and discussing services, such as vouchers for daycare, but that he did not apply for vouchers because "they never gave me anything in paperwork."

On cross-examination, Brandon stated that, although he did not file for divorce until November 13, he and Megan separated on May 9. He admitted that he did not inform DHS of the date of separation. He testified that the only contact he had with Megan since they had separated was during joint visitation, which was scheduled by DHS, and during attorney visits when they were represented by the same attorney. Brandon testified that he accepted the finding of Megan's guilt in harming their children and that he would not allow Megan to be around the children when she is released from prison. He also testified that if his children were injured, he would take them to the doctor.

On redirect, Brandon said that he found out B.D.'s feet were burned only after Megan had called him and told him; he then brought bandages home and returned to work. He said that he could not remember how long B.D. had the burns before they took her to the hospital. He said that B.D.'s injuries were not "that bad when it first happen[ed]," but he admitted that he never looked at B.D.'s feet. He said that when he saw B.D.'s bandaged feet, he wondered what had happened. Brandon said that he did not talk to doctors about B.D.'s burns because DHS asked him to leave the hospital.

Cassie Slater, the family service worker assigned to the case, testified that there had been no trial placements or weekend visits with Brandon. She said that the opportunity for weekend visitation was suspended after Brandon was seen with Megan when they were not supposed to be together. Slater acknowledged that Brandon had complied with the requirements of the case plan. She stated that DHS was asking for his parental rights to be terminated because he was not prepared to protect the children. She believed that Brandon was unwilling to protect the children because he and Megan were together when B.D.'s injuries occurred, and he did not take B.D. to the doctor; he stayed married to Megan until the day of the termination hearing; he did not notify DHS that he and Megan had separated; and he did not have a plan in place for the children if he regained custody. Slater noted that J.M. had sustained a broken femur and that B.D.'s feet were so badly burned that she required skin grafts and had to wear a compression sock. She added that B.D. might have permanent nerve damage to her feet. Slater testified that the injuries did not prohibit the children from being adopted and that there was interest from potential adoptive parents. In Slater's opinion, Brandon had not made substantial measurable progress in the case and had not worked diligently toward the goal of reunification because he had not shown that he could provide for the children and keep them safe from harm.

On cross-examination, Slater admitted that during the pendency of the case, she had been on leave on three different occasions and that during her leave, she was not an active participant in the case. Slater acknowledged that Brandon and Megan were divorced and that Megan had gone to prison, but she stated that, based on J.M.'s broken femur and B.D.'s burned feet, DHS had concerns about Brandon's ability to protect the children.

Brandon testified again. He stated that he believed Megan "could have" caused the children's injuries but that he "[did not] know if she did or not because [he] wasn't there." He also stated that when he and Megan were seen together, he was giving her a ride. Brandon testified that he and Megan had not lived together since they separated in May.

Following the hearing, the circuit court terminated the parental rights of both Brandon and Megan. The circuit court concluded that DHS had proved by clear and convincing evidence that termination of Brandon's rights was warranted under the subsequent-factors ground, the failure-to-remedy ground, and the adjudicated-as-a-result-of-abuse-that-could endanger-the-child's-life ground. In doing so, the circuit court found that

> [t]he question is the credibility of Mr. Martin in pursuing this matter, requesting that the children go back home with him. And the Court finds that his testimony is not credible. And that Mr. Martin, I think, loves his kids and wants to do what's right. But at the same time, I think, all of his - - all of his thoughts in this matter have dealt with the fact that he would wait and see what would happen regarding his wife. And, you know, he wouldn't be divorced today except the Court would go ahead - - went ahead and allowed him to present his divorce at this time. So the Court's concerned that - - there's a great hesitation on the part of Mr. Martin to admit that Ms. Martin had anything to do with the injuries that were sustained by these children. And the Court based upon the testimony and the evidence provided, the Court finds no other conclusion - - reasonable conclusion is that Ms. Martin is responsible for these injuries.
>
> . . . .
>
> The Court feels that there is a threat of harm by returning the children home. The Court has great concerns whether or not Mr. Martin would actually protect the children. I think if Ms. Martin showed up, Mr. Martin would allow her to have access to the children. That seems to be the whole problem that we've had.
>
> . . . .
>
> The Court's making a finding that Mr. Martin - - he's done parenting, has watched the Clock is ticking, he's done a physiological, but as far as noncompliance, he's not been able to show that he's got a support group. And even though he has indicated

that his mother was available even up to the point of retiring – – the mom was here. Mom left.

. . . .

We don't have any other testimony. You know, my concern is that if – – it's kind of, too little too late as far as that goes. . . .[W]e've never been able to substantiate anything regarding help by a family member. He indicated that his sister might be a possibility. He has very little contact with his sister.

Mr. Martin has never asked for extended visitation even though that was available. They have discussed that. There has always been concerns about his continual contact with Ms. Martin.

. . . .

The Court's concern is when the injuries were noted from both children, very much a hesitancy on the part of the mother and the father to see that they received medical care. And in fact the one with burned feet, the Court's seen the pictures in prior hearings. It's unbelievable that anybody could determine that the child did not need immediate . . . medical services. And that I cannot imagine a parent not wanting to see – – not wanting to inquire about the injuries sustained by the child to the extent that we've had them shown today.

It boils down to the fact that the father seems to have made a choice. His choice is more of a relationship with the mother. He does not want to admit that the mother may have done this. He waited until the last minute; did not go to the hearing. So it's real easy for him to say, I don't know exactly what she pled. I know she was convicted. And, you know, apparently she [may] have done it because she was convicted. He would not say in his own word – – make any expression at all indicating that she was at fault.

. . . .

Testimony was that there was not any discussion by the father or mother either one indicating that they had separated. Just all of a sudden they were not together, but still there has been testimony of contact, contact at the time of visitation.

The circuit court also found by clear and convincing evidence that it was in the best interest of B.D., J.M., and A.M., to terminate Brandon's parental rights. In making this finding, the circuit court specifically considered the likelihood that the children would be adopted if the termination petition were granted and the potential harm to the health and safety of the children if they were returned to Brandon.

Brandon appealed the order terminating his parental rights to the court of appeals, which affirmed. *See Martin v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 521, 504 S.W.3d 628. Martin then petitioned this court for review, and we granted the petition.[3] When we grant a petition for review, we consider the appeal as if it were originally filed in this court. *E.g.*, *Earls v. Harvest Credit Mgmt. VI-B, LLC*, 2015 Ark. 175, 460 S.W.3d 795.

## II. *Applicable Law*

The termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. *See J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). The first step requires proof of one or more statutory grounds for termination. *See* Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether termination is in the juveniles' best interest. *Id.* § 9-27-341(b)(3)(A). The best-interest analysis includes consideration of the likelihood that the juvenile will be adopted if the termination petition is granted and the potential harm caused by returning custody of the child to the parent. *Id.* § 9-27-341(b)(3)(A)(i) & (ii).

---

[3] We granted Brandon's petition for review to resolve a conflict between the court of appeals' decision in this case and prior decisions of this court. In *Martin*, 2016 Ark. App. 521, 504 S.W.3d 628, the court of appeals held that Brandon failed to preserve the issue of whether DHS presented sufficient proof that appropriate family services were offered. Brandon contends that *Martin* is at odds with prior decisions of this court in which we have held that, in a civil bench trial, a party may challenge the sufficiency of the evidence for the first time on appeal. We agree. In a long line of cases, this court had held that, in a civil bench trial, a party who does not challenge the sufficiency of the evidence at trial does not waive the right to so do on appeal. *See, e.g.*, *Contreras v. Ark. Dep't of Human Servs.*, 2014 Ark. 51, 431 S.W.3d 297; *Oates v. Oates*, 340 Ark. 431, 10 S.W.3d 861 (2000); *Bass v. Koller*, 276 Ark. 93, 632 S.W.2d 410 (1982).

SLIP OPINION

We review termination-of-parental-rights cases de novo. *E.g.*, *Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. 356. An order terminating parental rights must be based on clear and convincing evidence, which is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *See id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the circuit court's finding is clearly erroneous. *E.g.*, *Payne v. Ark. Dep't of Human Servs.*, 2013 Ark. 284. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *E.g.*, *Seago v. Ark. Dep't of Human Servs.*, 2011 Ark. 184, 380 S.W.3d 894.

### III. *Ground for Termination*

Brandon contends that DHS failed to prove that a ground for termination existed by clear and convincing evidence. The circuit court found that DHS had proved three grounds by clear and convincing evidence: the failure-to-remedy ground, the subsequent-factors ground, and the adjudicated-as-a-result-of-abuse-that-could-endanger-the-child's-life ground. We first consider Brandon's contention that DHS failed to prove the subsequent-factors ground, because he ended his relationship with Megan in May 2015 when they separated.

The subsequent-factors ground states that rights may be terminated when

> other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*.

DHS filed the original dependency-neglect petition for J.M. and B.D. on October 20, 2014, and the petition for A.M. was filed on November 13, 2014. Since the petitions were filed, in a separate criminal proceeding, Megan was found to be responsible for causing B.D.'s injuries, and she pleaded guilty to a battery charge. The circuit court found that, despite Megan's admission, Brandon continued his relationship with her and, therefore, "chose[] his children's abuser over his children." The circuit court did not find credible Brandon's testimony that he had separated from Megan in May, and the circuit court did not credit Brandon's testimony that he would protect the children if custody were returned to him.

Here, by his own testimony, Brandon had taken a "wait and see" approach to ending his relationship with Megan, and he was reluctant to admit that Megan had caused the children's injuries. He vacillated between acknowledging that Megan had caused the children's injuries and claiming that he did not know if Megan had harmed the children, because he was "not there." Brandon was given the opportunity to have unsupervised visitation with the children. The circuit court approved the visitation plan based on Brandon's assertion that he and Megan were separated and his promise that he would not allow Megan to have contact with the children during his visitation. Brandon lost the opportunity to spend more time with his children when the court found that he had maintained contact with Megan. The evidence showed that Brandon had maintained a relationship with Megan throughout the proceedings and that he was either incapable of severing contact with Megan or indifferent to doing so.

SLIP OPINION

The circuit court found that Brandon failed to show that he had a support group to help take care of the children if they were returned to his custody. Brandon's testimony demonstrated that he had no plan for the children's care if he regained custody. He stated that he had called a few daycares; however, he said that he did not obtain the daycare vouchers offered by DHS because "they never gave me anything in paperwork." He testified that his mother was willing to help him care for the children, but she was not present at the hearing to testify about her willingness to help, even though she had gone to the divorce hearing that took place just before the termination hearing. Brandon also claimed that his sister could help with the children, but she, too, failed to appear and testify about her willingness to do so.

Brandon disagrees with the circuit court's finding that DHS presented sufficient proof that appropriate family services were offered. In this case, the circuit court made two reasonable-efforts findings—one at the adjudication hearing on February 10, 2015, and another at the review hearing on May 12, 2015. Brandon did not appeal from either order. He concedes that his failure to challenge the circuit court's prior reasonable-efforts findings precludes this court from now reviewing any adverse rulings resulting from those orders not appealed from. *See Lewis v. Ark. Dep't of Human Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005). Brandon maintains, however, that DHS failed to offer sufficient proof of the services element during the eight-month period between the review hearing on May 12, 2015, and the termination hearing on January 19, 2016. We disagree. The record reflects that DHS offered daycare vouchers to Brandon, but he failed to take advantage of the services. Moreover, we disagree with Brandon's contention that his failure to separate from Megan

cannot serve as a basis to terminate his parental rights because there was no evidence presented that DHS ever offered him any services to address his relationship with Megan. Brandon does not indicate what particular services DHS could have offered him that would have prevented him from choosing Megan—his children's abuser—over his children. We hold that the circuit court did not clearly err in finding that DHS offered appropriate family services.

In reviewing the circuit court's evaluation of the evidence, we will not reverse unless the circuit court's finding of clear and convincing evidence is clearly erroneous. *E.g., Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001). In resolving the clearly erroneous question, we must give due regard to the opportunity of the circuit court to judge the credibility of witnesses and the weight to be given to their testimony. *See id.*, 42 S.W.3d 397. In this case, after hearing the evidence and determining that Brandon was not credible, the circuit court concluded that DHS had proved by clear and convincing evidence the subsequent-factors ground. We hold that the circuit court's decision was not clearly erroneous. Because DHS is required to prove only one ground for termination, *see* Ark. Code Ann. § 9-27-341(b)(3)(B), it is not necessary for us to consider Brandon's arguments concerning the other grounds for termination. *See Brumley*, 2015 Ark. 356.[4]

---

[4] We are not persuaded by Brandon's contention that the circuit court's "mistake of fact" concerning a prior finding of abuse compels reversal because the alleged mistake "was woven throughout and the basis for the grounds for termination and best interest determination." Abuse is but one of the grounds the circuit court found to terminate Brandon's parental rights.

IV. *Best Interest*

Brandon contends that the circuit court erred in finding that termination of parental rights was in the children's best interest. Two factors to consider in determining best interest are the likelihood of adoption and potential harm caused by returning the child to the custody of the parent. *See* Ark. Code Ann. § 9-27-341(b)(3)(A). Brandon does not contest the adoptability prong of the best-interest analysis. At the termination hearing, there was testimony from DHS worker Slater that the children's injuries did not prohibit adoption and that there was interest from potential adoptive parents. The circuit court properly found that the children are adoptable. *See Brumley*, 2015 Ark. 356 (citing *Thompson v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 124 (stating that testimony from a caseworker or an adoption specialist that the children were adoptable is sufficient)).

Brandon contends that the evidence was wholly insufficient to support a finding that he posed a risk of potential harm to his children. He states that the children were injured while he was working; that once the children were placed in foster care, he participated fully and did everything DHS requested; and that DHS's concern that he was not separated from Megan was based purely on speculation.

In considering potential harm caused by returning the child to the parent, the circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918. Potential harm must be viewed in broad terms, including the harm the child suffers from the lack of stability in a permanent home. *See Brumley*, 2015 Ark. 356.

In this case, the circuit court found that Brandon had failed to seek immediate medical care for the children's injuries. The evidence showed that Brandon was either unable or unwilling to recognize the seriousness of the injuries to his children. He testified that when he saw that B.D.'s feet had been bandaged, he wondered what had happened. But there was no evidence that Brandon ever asked about the cause of her injuries. He admitted that he never looked at B.D.'s feet after they had been burned. He could not remember if he had asked how J.M.'s leg had been broken.

The circuit court noted that Brandon did not obtain a divorce from Megan until the day of the termination hearing and found that even after Megan pleaded guilty to a felony-battery charge, Brandon was still hesitant to believe that she had anything to do with his children's injuries. Based on this evidence, the circuit court found that Brandon had chosen Megan over his children, and it expressed concern whether Brandon would protect the children from Megan upon her release from prison. We conclude that this evidence of potential harm, coupled with the children's adoptability, supports the circuit court's finding that termination of Brandon's parental rights was in the best interest of the children.

Affirmed; court of appeals opinion vacated.

WOOD, J., concurs.

**RHONDA K. WOOD, Justice, concurring.** I join the majority opinion but write separately to emphasize the failure of the attorneys and the circuit court to ensure that the statutory scheme passed by the General Assembly was followed in this case. The children undoubtedly suffered unspeakable abuse and neglect. Cases such as this are difficult for all involved. Dockets are crowded and attorneys in this area are typically underpaid and

overworked. However, there is no excuse for repeatedly failing to have timely hearings. Cases involving abused and neglected children must be a priority in our justice system. Here, the adjudication and review hearings were not held in a timely fashion. The orders were not timely entered. Additionally, the circuit court failed to hold the second six-month review hearing and failed to hold a permanency planning hearing.

An adjudication hearing in a dependency-neglect case "shall be held" within 30 days of the probable cause hearing. Ark. Code Ann. § 9-27-327(a)(4)(A) (Repl. 2015). As the law now stands, upon a motion by the court or a party, this hearing may be continued up to 60 days after removal. Ark. Code Ann. § 9-27-327(a)(4)(B). At the time this case took place, the law provided that the hearing could be continued up to 60 days after the probable cause hearing for good cause shown. Ark. Code Ann. § 9-27-327(a)(2)(A) (Supp. 2013). In the present case, the adjudication hearing was not held within 30 days. Rather at the probable cause hearing, the case was set for 56 days out. The record reflects that the parties appeared for the adjudication, but the Department of Human Services sought a continuance thus the adjudication hearing was rescheduled for 95 days from the probable cause hearing, well past the statutory time frame. That hearing likewise did not happen because the judge continued it for health reasons. The result was that the adjudication hearing for B.D. and J.M. was held 112 days following the probable cause hearing, and the adjudication hearing for A.M. was held 84 days following the probable cause hearing. Both well beyond the statutory maximum time frame then of 60 days. To compound the issue, the adjudication order was not filed until August 27, 2015, which was six months after the adjudication

hearing, three months after the one and only review hearing, and ten days after the Department filed the petition for termination of parental rights.

Next, a review hearing shall take place every six months if the child is placed outside of the home. Ark. Code Ann. § 9-27-337(a)(1)(A) (Supp. 2013). The first review hearing shall be held no later than six months from the initial out-of-home placement and every six months thereafter if the child continues to be placed out of the home. Ark. Code Ann. § 9-27-337(a)(2)(A),(B). In this case, the court did not hold the first review hearing until almost seven months from the initial removal of B.D. and J.M. No subsequent review hearing was ever held. Rather, the next court hearing was the termination hearing, which was almost nine months after the first, and only, review hearing.

Last, a court shall hold a permanency planning hearing "no later than twelve months" from the date the child is removed from the home. Ark. Code Ann. § 9-27-338(a)(1)(A) (Supp. 2013). In this case, the court never held a permanency planning hearing even though B.D. and J.M. were placed out of their home for fifteen months prior to termination and A.M. was placed out of the home for fourteen months.

To summarize, these children were removed from the home but not adjudicated dependent-neglected for almost four months. That order was not entered for another six months. The circuit court held only one review hearing and then severed these children from their parents a little over a year later. While I can find no legal error regarding the circuit court's termination decision, there was most certainly a failure in the process of protecting these children. The mother had three older children previously removed and

B.D. had been removed in the past and returned to her mother's care only to be seriously abused. The father refused to recognize the danger and protect the children.

However, even in the face of horrendous abuse, the system must function in a timely and orderly manner, especially when children are involved. The General Assembly designed the law to protect children. Here, the record is eerily silent as to why counsel for the Department of Human Services, parent counsel, and the children's ad litem did not demand these hearings occur and occur timely and that orders were entered. Circuit courts and attorneys in dependency-neglect cases must be aware of the statutory time periods and ensure that dependency-neglect cases proceed as required. To do otherwise is simply unacceptable.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.