

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-16-576

BRANDON MARTIN
                                    APPELLANT

V.

ARKANSAS DEPARTMENT OF
HUMAN SERVICES AND MINOR
CHILDREN
                                    APPELLEES

Opinion Delivered NOVEMBER 2, 2016

APPEAL FROM THE LAWRENCE
COUNTY CIRCUIT COURT
[NO. 38JV-14-97]

HONORABLE KEVIN KING, JUDGE

AFFIRMED

## DAVID M. GLOVER, Judge

The Lawrence County Circuit Court terminated Brandon Martin's parental rights to

his three children, daughter B.D., born March 23, 2012, son J.M., born December 26, 2013,

and daughter A.M., born November 7, 2014.[1] Brandon now appeals the termination, arguing

that the circuit court erred in finding the Arkansas Department of Human Services (DHS)

proved the grounds alleged in the termination petition by clear and convincing evidence, that

the termination decision was based on a mistake of fact that the juveniles were adjudicated

dependent-neglected as a result of abuse, and that the termination was not in the best interest

of the children. We affirm the trial court's decision.

This case began on October 20, 2014, when DHS filed a petition for emergency

custody of B.D. and J.M.[2] A seventy-two-hour hold was taken on both children on October

---

[1]The children's mother, Megan Martin, consented to the termination of her parental
rights and is not a party to this appeal.

[2]A.M. was not born until November 7, 2014.

17, 2014, after the Martins had taken J.M. to the hospital on October 16 based on concerns of an injury to his left leg. According to affidavits, J.M. was taken to LeBonheur Hospital, where a report was made to the child-abuse hotline for suspected physical abuse because nine-month-old J.M. had a traverse fracture of the left femur, and the explanation for the broken bone did not fit with the injury. A safety assessment was to be performed on the Martin home prior to J.M. returning home; it was then that the investigator noticed bruising on B.D.'s face and discovered that her feet had been burned. The investigator observed B.D.'s wrapped feet, the fact that the gauze was yellowish and had a strong odor emanating from it, and that B.D. began to cry in pain when her grandfather attempted to unwrap her feet. Megan explained B.D.'s injuries by saying B.D. sat in front of a space heater for too long and burned her feet; Megan said she put B.D.'s feet in cold water, put gel on them, and wrapped her feet. However, an examination revealed B.D.'s feet had red, peeling, burned skin, not only all over her feet, but also up to her ankles; her big toes had no skin on the bottom of them; and her injuries appeared to be immersion burns. The burns were determined to be second-degree burns; B.D. was transferred to Arkansas Children's Hospital (Children's), where she underwent surgery for the injuries to her feet. In addition to the black bruise on her face, there was a knot on the top left side of B.D.'s forehead, as well as scratches on her neck and arms and more bruising on her back and left side. An ex parte order for emergency custody and a probable-cause order were both entered on October 21.

On November 13, 2014, DHS filed a petition for emergency custody and dependency-neglect for A.M., who was born November 7, 2014, based on the alleged physical abuse to

B.D. and J.M.  An ex parte order granting DHS emergency custody of A.M. was filed on November 17, 2014, and a probable-cause order as to A.M. was filed on November 18.

The adjudication hearing was continued until January 20, 2015, and then again until February 10; even though the adjudication hearing was held on February 10, the order adjudicating the children dependent-neglected was not filed until August 27, 2015.  In the adjudication order, the Martins stipulated that B.D., by a preponderance of the evidence, was a dependent-neglected juvenile, and the trial court found that J.M. and A.M. were also dependent-neglected juveniles because of B.D.'s adjudication.  The goal of the case was reunification.

A review hearing was held on May 12, 2015; the goal of the case remained reunification, and the trial court found DHS had made reasonable efforts to provide family services.  The trial court ordered visitation to be at the discretion of DHS; as to Brandon, visitation could include every-other-weekend visits, with one-hour visitation during the off weeks, with attorney ad litem approval, so long as drug screens were negative prior to visitation.  Brandon was also prohibited from allowing Megan to have contact with the children.  On May 15, 2015, an emergency motion to modify visitation was filed by DHS, asserting that Brandon had been given unsupervised visitation based on his testimony that he and Megan were separated and he would not allow her to have access to the children; however, the Martins were seen together in Brandon's car on May 14.[3]

---

[3] While the record reveals that the Martins responded to this motion, it does not appear that an order was filed with regard to this motion.



On August 17, 2015, DHS filed a petition to terminate the Martins' parental rights. DHS alleged five grounds for termination with respect to Brandon—Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* (Repl. 2015) (the court has adjudicated the juvenile dependent-neglected and the juvenile has continued to be out of the custody of the parent for twelve months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent); Arkansas Code Annotated section 9-27-341(b)(3)(B)(ii)(*a*) (the juvenile has lived outside the home of a parent for a period of twelve months, and the parent has willfully failed to provide significant material support in accordance with the parent's means); Arkansas Code Annotated section 9-27-341(b)(3)(B)(vi)(*a*) (the court has found the juveniles or a sibling dependent-neglected as a result of abuse that could endanger the life of the child, which was perpetrated by the juveniles' parent); Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(*a*) (other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare, and that, despite the offer of appropriate services, the parent manifested the incapacity or indifference to remedy the subsequent issuess or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent; and Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(*a*)*(3)* (the parent has subjected the juveniles to aggravated circumstances).  In an order filed March 20, 2016, the trial court found it was in the children's best interest to terminate Brandon's parental rights and terminated his parental rights on the

4

SLIP OPINION

"twelve months, failure to remedy" ground, the ground finding the children dependent-neglected as a result of abuse that could endanger the lives of the children, and the "other factors" ground.

At the termination hearing, Brandon testified that his divorce from Megan was finalized "a couple of hours" before the termination hearing; he said it took so long because he wanted to see what happened in the criminal proceedings against Megan and in the termination proceedings. He stated that at first, he did not have concerns about whether Megan had injured the children, but because the court had found her guilty, he believed it; however, Brandon changed his testimony, saying he still did not know whether his ex-wife had done this to the children. When pressed further about why he did not know whether Megan had burned B.D.'s feet, Brandon replied he honestly did not know, even after acknowledging he heard a doctor testify about B.D.'s burns. Brandon also could not remember if he had asked how J.M.'s leg had been broken.

Brandon testified that if his children were returned to him, his mother would assist him with the children; however, she was not present at the termination hearing, although she had been at the divorce hearing just a few hours before the termination hearing. He said that if his mother could not help, his sister would, but he admitted he had not been to her house in more than a year. He testified he had called daycare centers, but he had nothing set up yet for the children. Brandon stated that while he saw the children on a regular basis, he had not seen B.D.'s feet since they had been burned, he had only asked once how her feet were, and he did not know if B.D. was walking.

5

On cross-examination, Brandon stated that while he only recently filed for divorce on November 13, he and Megan separated on May 9. He said the only contact he had with Megan since they had separated was during visitation (which was scheduled jointly by DHS) and attorney visits when they used the same attorney. He said he accepted the finding of Megan's guilt in harming their children, and while the safety of the children would be of concern to him if they were to be around her after she is released from prison, he would not allow her to be around them. He explained the reason he waited from the May separation to November to file for divorce was that they were talking about what to do and kept waiting to see what was going to happen in court. Brandon said if custody of his children was returned to him and they were injured in his care, he would seek medical attention for them.

On redirect, Brandon admitted that early in the case, he was given visitation every other weekend, but it was terminated because he and Megan were seen together. When questioned about B.D.'s burns, Brandon indicated he could not remember how long she had the burns before they took her to the hospital. He said they did not take her to the hospital sooner because it was "not that bad" when it first happened; however, he further admitted he never looked at the injuries. According to him, he found out B.D.'s feet were burned only after Megan had called him and told him; he then brought bandages home and returned to work. Brandon said DHS made them take B.D. to the hospital, where she was ultimately hospitalized for six weeks. He admitted he did not talk to the doctors at Children's about B.D.'s burns, claiming he could not do so because DHS had asked him to leave.

6

Cassie Slater, the family service worker assigned to the case, testified there had been no trial placements or weekend visits with Brandon; she stated while there had been discussions of weekend visitation with Brandon, this was precluded when the Martins were seen together. Slater admitted Brandon had complied with previous court orders, but DHS was asking for his parental rights to be terminated because he was not prepared to protect the children. To support this assertion, Slater pointed to the fact that Brandon and Megan were together when B.D.'s injuries occurred, he remained married to Megan until the day of the termination hearing, he did not notify DHS that they had separated, and he did not have a plan in place for the children if he regained custody. Slater noted J.M. sustained a broken femur, and B.D.'s feet were burned so badly that she required skin grafts, had to wear a compression sock, and might have permanent nerve damage to her feet. Slater stated the injuries did not prohibit the children from being adopted, and there was interest from potential adoptive placements. In her opinion, Brandon had not made substantial measurable progress because he had not shown he could provide for the children and keep them safe from harm.

On cross-examination, Slater admitted that during the pendency of the case, she had been on leave on three different occasions, during which times she was not an active participant in the case. She acknowledged Brandon and Megan were divorced, but she stated DHS had concerns about his ability to protect the children, based on B.D.'s burned feet and J.M.'s broken femur, and she did not believe the concerns were unfair. DHS rested after Slater's testimony.



Brandon testified again. He stated he believed Megan could have caused the children's injuries. He also stated that when he and Megan were seen together, he was only giving her a ride, and he was not under a court order to stay away from her.

In terminating Brandon's parental rights, the trial court specifically found Brandon's testimony not to be credible, and that although it believed Brandon loved his children, all of Brandon's thoughts and actions indicated a "wait and see" approach to the case with regard to his wife. The trial court concluded Brandon would not have been divorced at the termination hearing except for the fact that it allowed him to present his divorce petition just before the termination hearing. The trial court found "great hesitation" on Brandon's part to admit Megan had anything to do with the children's injuries, when in fact there was no other reasonable conclusion except that Megan was responsible for the injuries. The trial court found it was in the best interest of the children that Brandon's parental rights be terminated, as the children were adoptable and there was a threat of harm in returning them to Brandon due to a concern whether he would protect them. The trial court further pointed out that while Brandon testified his mother would be able to help him, she left after the divorce hearing and was not present for the termination hearing; that while his sister might be a possibility, he had little contact with her; that Brandon had never asked for extended visitation; that there was much hesitancy to seek medical treatment for the children, especially B.D.; that it was the trial court's opinion Brandon chose his relationship with Megan over his children; and that Brandon did not want to admit that Megan had hurt the children.



*Standard of Review*

We review termination-of-parental-rights cases de novo. *Spangler v. Arkansas Dep't of Human Servs.*, 2012 Ark. App. 404. Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents. *Watson v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 28. However, parental rights will not be enforced to the detriment or destruction of the health and well-being of the children. *Brumley v. Arkansas Dep't of Human Servs.*, 2015 Ark. App. 90, 455 S.W.3d 347.

An order terminating parental rights must be based on clear and convincing evidence. *Camarillo-Cox v. Arkansas Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). Termination of parental rights is a two-step process; the first step requires proof of one or more of the statutory grounds for termination found in Arkansas Code Annotated section 9-27-341(b)(3)(B). *Samuels v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 527, 443 S.W.3d 599. The second step requires consideration of whether termination is in the juveniles' best interest. *Id.* Clear and convincing evidence is that degree of proof that will produce in the finder of fact a firm conviction as to the allegation sought to be established; in termination cases, that it is in the children's best interest to terminate parental rights, as well as the existence of at least one statutory ground for termination. *Spangler, supra.* When the burden of proof is clear and convincing evidence, the inquiry on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous; a finding is clearly erroneous when, although there is evidence to support it, the appellate court, on the entire evidence, is left with a definite and firm conviction that a

SLIP OPINION

mistake has been made. *Watson*, *supra*. However, we do give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

*Mistake of Fact—Finding of Abuse*

Brandon first argues the termination decision was based on a mistake of fact that the juveniles were adjudicated dependent-neglected as a result of abuse. This argument is premised on the fact he and Megan stipulated in the adjudication hearing that B.D. was dependent-neglected as a result of inadequate supervision, and the trial court found J.M. and A.M. dependent-neglected based on B.D.'s status, as their sibling, as a dependent-neglected juvenile. Brandon argues at no time during the case was a finding of abuse made, nor was there a finding he had perpetrated any abuse; there was only evidence the children had sustained injuries. Brandon contends that despite never having made a finding of abuse, the termination-order grounds and best-interest finding were based on a finding of abuse.

We disagree with Brandon's assertion. Clearly, the children suffered injuries, and Megan was found to be responsible for those injuries in a separate criminal proceeding. However, this does not negate the fact that Brandon had a responsibility to have his children's injuries examined, which he failed to do for a significant period of time, especially as to B.D., whose injuries occurred before the Martins took J.M. to the hospital for his own injuries. It was reported the gauze on B.D.'s feet was yellow, there was an odor emanating from her feet, and she cried when an attempt was made to remove the gauze; yet no one had taken B.D. to

SLIP OPINION

the doctor to have her examined. There is no allegation Brandon caused these injuries—rather, he failed to protect his children after they had suffered these injuries. Furthermore, abuse is but one of the grounds the trial court found to terminate Brandon's parental rights. Because other grounds exist, this argument has no merit.

*Best Interest*

Brandon next argues termination was not in the children's best interest. He does not contest the adoptability prong of the best–interest analysis; he contends only that he does not pose a risk of potential harm to his children. He states the children were injured while he was working; once the children were placed in foster care, he participated fully and did everything DHS requested; and the trial court's concern that he was not separated from his wife was based purely on speculation. We do not find this argument persuasive.

In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. *Welch v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability the child receives in a permanent home. *Collins v. Arkansas Dep't of Human Servs.*, 2013 Ark. App. 90. Progress toward or even completion of the case plan is not a bar to termination of parental rights. *Villasaldo v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 465, 441 S.W.3d 62. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his children. *Schaible v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 541,

444 S.W.3d 366. Here, the trial court specifically found Brandon's testimony not credible. The trial court noted Brandon had obtained a divorce mere hours before the termination hearing; that Brandon was still hesitant to believe Megan had anything to do with his children's injuries; that Brandon failed to seek immediate medical care for the children's injuries; and that Brandon chose Megan over his children and the court was concerned whether Brandon would protect the children from Megan once she is released from prison. We cannot say these findings were clearly erroneous. Brandon took a "wait and see" approach before proceeding with a divorce from Megan; even at the termination hearing, when pressed about his belief whether Megan had harmed the children, he still continued to say he did not know if Megan had done it.

*Ground for Termination*

Brandon's last argument is that DHS did not prove a ground for termination existed by clear and convincing evidence. DHS need prove only one ground for termination. Brandon argues under the "failure-to-remedy" ground that the basis for removal was for inadequate supervision, and the trial court found, under this ground, Brandon had failed to separate himself from Megan and had failed to present a support group to assist in caring for the children if they were returned to his custody, neither of which was the cause for removal. We disagree. The children suffered injuries due to inadequate supervision, and those injuries were magnified by continued inadequate supervision when the parents failed to seek medical attention in a timely manner, especially with respect to B.D. The trial court clearly found Brandon's testimony lacked credibility, and this court gives great deference to the trial court's

ability to determine the credibility of the witnesses before it. The trial court further did not believe Brandon would protect the children's health and safety if they were returned to him, which is the reason the children were removed in the first place. A parent's past behavior is often a good indicator of future behavior. *Hernandez v. Arkansas Dep't of Human Servs.*, 2016 Ark. App. 250, 492 S.W.3d 119. We cannot say the trial court's decision was clearly erroneous.

Although DHS is required to proved only one ground for termination, we also hold DHS proved the "other factors" ground as well. Brandon argues the reason for this finding was because he had failed to separate himself from Megan, and that he had in fact done so. While he asserted he had separated from Megan in May, the fact was he did not file for divorce until November, and he was then granted the divorce only hours before the termination hearing. By his own testimony, he had taken a "wait and see" approach to severing bonds with Megan, and he was still ambivalent at the termination hearing as to whether Megan had caused the children's injuries. The trial court was entitled to take this information into consideration in determining Brandon's lack of credibility and inability to keep the children safe from harm. Furthermore, by his own testimony, Brandon had no plan for the children's care if he regained custody—he had called only a few daycares, and while he asserted that his mother was willing to help him with the children, she was not present at the termination hearing to testify about her willingness to be involved in the care of the children, although she had come to the divorce hearing just prior to the termination hearing. Brandon further claimed his sister could also help, but she also failed to appear and testify as

SLIP OPINION

to her willingness to do so.

Brandon further contends under both of these grounds that DHS did not make a meaningful effort to rehabilitate him and offer services to address these issues. He acknowledges there were two reasonable-efforts findings—one at the adjudication hearing and another at the review hearing—and he concedes the appellate court is precluded from reviewing those findings because he did not appeal from those orders. He then argues that during the eight months between the review hearing and the termination hearing, DHS failed to offer him services. Brandon did not make this argument below and is precluded from now making it on appeal. *Brumley*, *supra*.

Affirmed.

HIXSON and HOOFMAN, JJ., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.