LARRY D. VAUGHT, Judge
Charles Elliott appeals the Columbia County Circuit Court's order terminating his parental rights to his daughter, A.E. (born 4/29/2017). We affirm.
On May 14, 2017, the Arkansas Department of Human Services (DHS) received a report of child maltreatment resulting in the hospitalization of an infant, then fifteen-day-old A.E. DHS exercised emergency custody over A.E. the same day. The child-maltreatment report stemmed from the fact that newborn A.E. had been taken to the emergency room "covered in rat bites," which were severe. A.E. had approximately seventy-five to one-hundred rat bites all over her body, with most of the bites concentrated on her hands, arms, face, and head. There were "numerous bites on [her] forehead, nose, cheeks, and around [her] eyes." The most prominent injury was a three- to four-centimeter *489 wound on her forehead where her flesh had been removed down to the layer just above her skull. Medical-care providers also observed that the diaper A.E. was wearing at the hospital contained rat droppings. The evidence revealed that the injuries had occurred while A.E. was in the care of her mother (who is not a party to this appeal) and her father, Elliott. Elliott stated that he had been woken up by A.E.'s crying at approximately five-thirty that morning, had discovered her injuries, and saw footprints that he identified as rat footprints. Yet, even though A.E. was severely injured and bleeding, Elliott and the child's mother did not immediately seek medical attention. They waited for more than five hours before taking A.E. to the emergency room.
The circuit court then held a probable-cause hearing, finding that the child should remain in DHS custody. Elliott appeared at that hearing and was named A.E.'s putative father. The court ordered DHS to provide a referral for DNA testing to establish paternity.
The court held an adjudication hearing on June 23, 2017, at which time it found that A.E. was dependent-neglected based on her mother's failure to provide the child with a safe home, adequate supervision, necessary medical attention in a timely manner, and protection from neglect. Despite having been properly served, Elliott was not present at the adjudication hearing. The adjudication order was signed on August 2, 2017, but it was not filed until July 25, 2018.
On September 15, 2017, the court recognized Elliott as A.E.'s biological father based on DNA testing. The court held a review hearing on November 3, 2017, and found that Elliott had contributed to A.E.'s dependency-neglect and was not a fit parent for the purpose of custody or visitation. The court noted that Elliott was incarcerated in the county jail pending felony charges related to the events giving rise to A.E.'s dependency-neglect case. Also on November 3, the court terminated A.E.'s mother's parental rights, and DHS filed a petition for the termination of Elliott's parental rights. The petition alleged that Elliott's parental rights should be terminated based on two statutory grounds: (1) the circuit court had found the juvenile dependent-neglected as a result of neglect or abuse that could endanger her life, pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(vi)(a) (Supp. 2017); and (2) there was little likelihood that services to the family would result in successful reunification, pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(a)(3)(B) .
On January 5, 2018, the circuit court held a hearing on DHS's petition to terminate Elliott's parental rights. At the hearing, Dr. Karen Farst, who was involved in A.E.'s care at Arkansas Children's Hospital (Children's) and who was recognized as an expert in general pediatric medicine and child-abuse pediatric care, testified to the seriousness of A.E.'s injuries. She stated that when A.E. arrived at Children's, she was in shock, "to the point that she needed life-saving intervention." Dr. Farst testified that A.E. required a blood transfusion, wound care, and specialty care by a plastic surgeon based on the extensive injuries to her face. Dr. Farst also testified that A.E. presented at Children's with a condition called apnea, which occurs when a person stops breathing for a period of time. Dr. Farst explained that apnea will eventually cause a patient's heart to stop, "[s]o if you don't intervene on that, then it's a fatal event." Because of the apnea, A.E. had to have a breathing tube placed in her throat as a life-saving measure. Dr. Farst stated that "had [A.E.] not been taken for professional medical care, she *490 would not have survived." These life-saving measures were necessary due to the severity of A.E.'s injuries, which were explained in detail by Dr. Farst at the termination hearing. Finally, Dr. Farst testified that A.E. could feel pain, vocalized in response to pain, and that the injuries would have taken "a prolonged period of time" to occur, meaning that the baby "definitely felt and responded" audibly to the rat bites while in Elliott's care.
A DHS caseworker testified to Elliott's many unresolved issues and discussed what services might be available to help him address those issues. For example, she testified that Elliott was currently incarcerated but that if he were somehow released that day, he would still need to find appropriate housing and employment, obtain mental-health treatment, and work a case plan addressing the issues that initially caused the child's removal from his care. The caseworker testified that, even if released that day, Elliott "would not be fit to take custody today." While the caseworker acknowledged that DHS does have the ability to provide services aimed at helping a person secure housing, employment, and mental-health treatment, she did not know of any services that would be currently available to Elliott during his incarceration that would be likely to lead to successful reunification. The caseworker also testified that she believed termination was in A.E.'s best interest because Elliott "remains detained in jail, and he can't have a child in jail," and "[i]f he were released and she was placed in his care, I am saying I believe she would be neglected further." The caseworker also stated that A.E. was highly adoptable and that DHS had numerous families waiting to adopt a child with her characteristics.
At the close of DHS's case, Elliott's attorney made an oral motion to dismiss the petition for termination of parental rights, arguing only that none of the testimony presented at the hearing linked Elliott to the injuries suffered by the child. In response, DHS argued that exhibit 2, which was before the court, contained Elliott's acknowledgement that the child was in his care at the time of her injuries. The court denied the motion. Elliott did not testify or provide any other evidence.
The court found that DHS had presented sufficient proof that termination was appropriate under both statutory grounds alleged in the petition and that termination was in the child's best interest because returning A.E. to Elliott's care would expose her to a significant risk of harm and that she has a high likelihood of being adopted. Elliott has appealed the termination of his parental rights.
The standard of review in appeals of termination of parental rights is de novo, but we reverse a circuit court's decision to terminate parental rights only when it is clearly erroneous. Ullom v. Ark. Dep't of Human Servs., 340 Ark. 615, 12 S.W.3d 204 (2000) ; Mitchell v. Ark. Dep't of Human Servs. , 2013 Ark. App. 715, 430 S.W.3d 851 ; Brewer v. Ark. Dep't of Human Servs. , 71 Ark. App. 364, 43 S.W.3d 196 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a distinct and firm conviction that a mistake was made. Wade v. Ark. Dep't of Human Servs. , 337 Ark. 353, 990 S.W.2d 509 (1999) ; Knuckles v. Ark. Dep't of Human Servs. , 2015 Ark. App. 463, 469 S.W.3d 377 ; Hopkins v. Ark. Dep't of Human Servs. , 79 Ark. App. 1, 83 S.W.3d 418 (2002).
Elliott's first argument on appeal is that the circuit court lacked subject-matter jurisdiction to enter the termination order, and that doing so violated his due-process rights because the circuit court failed to enter a timely adjudication *491 order. Elliott's arguments are unpreserved for our review and, alternatively, are meritless. To the extent that Elliott frames this issue as a due-process violation, he failed to make that argument below, and it is not preserved for appeal. We will not consider arguments made for the first time on appeal, even constitutional arguments, because doing so deprives the circuit court of the opportunity to fully develop the issue. Mercado v. Ark. Dep't of Human Servs. , 2018 Ark. App. 164, at 8-9, 544 S.W.3d 595, 600 (finding the appellant's due-process argument unpreserved for appeal). However, Elliott also frames his challenge as a jurisdictional matter, and the Arkansas Supreme Court has previously held that subject-matter jurisdiction may not be stipulated to or waived by the parties and, "if lacking, cannot be induced simply because there was no objection." J.W. Reynolds Lumber Co. v. Smackover State Bank , 310 Ark. 342, 352, 836 S.W.2d 853, 858 (1992). If Elliott were correct in presenting this as a jurisdictional issue, lack of preservation would not be an impediment to our review. The Arkansas Supreme Court has also previously clarified, however, that a circuit court's failure to file a timely order pursuant to the deadlines set out in the Arkansas Juvenile Code is not jurisdictional. Wade v. Ark. Dep't of Human Servs. , 337 Ark. 353, 990 S.W.2d 509 (1999). Elliott acknowledges as much but argues for a change in the case law mandating that compliance with statutory deadlines is jurisdictional. Because we have no authority to override or ignore decisions of the Arkansas Supreme Court, we need not further entertain his request.
Elliott next argues that "the no reunification services order is erroneous" because DHS failed to comply with the requirements for obtaining such an order under Arkansas Code Annotated section 9-27-365. This argument has no merit because no such order was entered. The record reveals that no motion was made seeking a "no reunification services order," no hearing was held, and no order entered. However, in the November 3, 2017 review order, the court included one line stating that "reunification services were not required to be made to the family." To the extent that Elliott argues that this sentence in the review order "tainted the proceedings" regarding the termination of his parental rights, he failed to preserve that issue because he never raised it below. See Mercado , supra .
Moreover, both the testimony at the termination hearing and the findings entered by the court in its termination order reveal that the court clearly considered the availability and likelihood of success of reunification services when determining that termination was appropriate under the aggravated-circumstances ground, which required a finding that there was little likelihood that services to Elliott would result in successful reunification. The court also found that termination was warranted under section 9-27-341(b)(3)(B)(vi)(a) , the statutory ground involving neglect that endangered the child's life, which does not require any showing that DHS provided meaningful services or that further services would not likely result in successful reunification. As a result, Elliott cannot show prejudice from the court's allegedly erroneous statement in the review order that reunification services were not required because no such services were required under one of the two grounds on which Elliott's rights were terminated.
Elliott next challenges the sufficiency of the evidence supporting the court's findings that DHS had proved two independent statutory grounds for termination.
*492 [1] We have repeatedly held that DHS need only prove one ground for termination, so we must affirm if the evidence supports either or both of the statutory grounds at issue in this case. Martin v. Ark. Dep't of Human Servs. , 2016 Ark. App. 521, at 11, 504 S.W.3d 628, 635. Arkansas Code Annotated section 9-27-341(b)(3)(B)(vi) establishes a statutory ground for the termination of parental rights where "[t]he court has found the juvenile or a sibling dependent-neglected as a result of neglect or abuse that could endanger the life of the child, sexual abuse, or sexual exploitation, any of which was perpetrated by the juvenile's parent or parents or stepparent or stepparents." Ark. Code Ann. § 9-27-341(b)(3)(B)(vi). Elliott does not contest the fact that DHS proved that A.E.'s life was endangered. His only argument is that because paternity was not established before the incident and he was not made a party until October 20, 2017, Elliott "was not a parent" when the child was injured. This argument has no merit.
The Juvenile Code's definition of "parent" includes a man who "has been found by a court of competent jurisdiction to be the biological father of the juvenile." Ark. Code Ann. § 9-27-303(40). We have explained that "paternity relates to the biological relationship between a man and child." Ellis v. Bennett , 69 Ark. App. 227, 230, 10 S.W.3d 922, 924 (2000). The biological relationship between Elliott and A.E., which was the basis for the circuit court's finding, was present from the moment A.E. was born-the circuit court's order did not create it. The statute does not say that the abuse or neglect must be perpetrated by "someone who has been legally adjudicated to be the juvenile's parent prior to the event." It simply states "a parent," and under any plain reading of that term, Elliott was a parent from the day his child was born, even if the circuit court did not formally recognize him as such until later. We also reject Elliott's argument that such an interpretation creates an ex post facto application of the Juvenile Code. At the time of the neglect, the biological relationship between A.E. and Elliott already existed; all relevant Juvenile Code provisions were in effect; and Elliott had fair notice of the possible consequences of such neglect.[2] We therefore affirm as to the sufficiency of the evidence supporting at least one statutory ground for termination of Elliott's parental rights.
Elliott's last point on appeal is a challenge to the court's finding that returning A.E. to his custody would expose *493 her to a significant risk of potential harm.[3] He argues that the court erroneously relied on his incarceration to establish the risk of harm, but he is mistaken. The DHS caseworker also testified that, if Elliott were released that very day and A.E. placed in his immediate care, the caseworker believed "she would be neglected further." The case file contained evidence that Elliott had an ongoing drug problem that contributed to his neglect of A.E. At the time of the child's removal, he tested positive for THC and admitted using a friend's prescription medications. He admitted to police that he had been using illegal drugs at the time that A.E.'s injuries occurred. Dr. Farst's report indicated that Elliott has a history of methamphetamine use, for which he had already completed a rehabilitation program prior to neglecting A.E. In addition to these problems, Elliott was incarcerated, lacked stable housing, lacked a stable income, and faced pending felony charges. Given all these factors, we see no error in the court's risk-of-harm finding, and we affirm on this point.
Affirmed.
Virden and Gladwin, JJ., agree.

Although Elliott did not renew his motion to dismiss at the close of all evidence, the Arkansas Supreme Court has explained that "[i]n a long line of cases, we have ruled that, in a nonjury trial, a party who does not challenge the sufficiency of the evidence does not waive the right to do so on appeal." Ingle v. Ark. Dep't of Human Servs. , 2014 Ark. 53, at 8, 431 S.W.3d 303, 307 (citing $15,956 in U.S. Currency v. State , 366 Ark. 70, 233 S.W.3d 598 (2006) ). This is not so for nonsufficiency-related challenges, such as Elliott's due-process argument and his claim that the court erred by ordering that no reunification services were required. In Ingle , the Arkansas Supreme Court differentiated between sufficiency claims and arguments that the court's actions were not authorized under the Juvenile Code.

Because the usual justification for the prohibition on ex post facto laws is that prior notice of the law is necessary to allow people the opportunity to conform their actions to those legal requirements, Garrett v. State , 347 Ark. 860, 865, 69 S.W.3d 844, 847 (2002), Elliott's ex-post-facto argument raises the question of whether, had he been legally designated a "parent" at the time of the neglect, he would have done something differently to prevent the child's injuries.

Elliott did not raise this point below, but because this appeal arises from a nonjury trial, we may address his best-interest argument to the extent that it is a challenge to the sufficiency of the evidence. Ingle , 2014 Ark. 53, at 8, 431 S.W.3d at 307 (citing $15,956 in U.S. Currency , 366 Ark. 70, 233 S.W.3d 598 ).