WAYMOND M. BROWN, Judge *15 Appellant appeals from the circuit court's order terminating her parental rights to B.G.,[1] born 06/13/2017.[2] On appeal, she argues that (1) there was insufficient evidence to support the grounds on which her rights were terminated and (2) termination was not in B.G.'s best interest. We affirm.
There was already an open protective-services case after there was a true finding for prenatal exposure to B.G. who was born testing positive for amphetamine, benzodiazepine, and buprenorphine. Appellant had also tested positive for THC, amphetamine, benzodiazepine, and buprenorphine.
A visit was made to appellant's home to assess the safety of B.G. on September 19, 2017. A call had been made to family services worker (FSW) Jordan Jackson on September 17, 2017, regarding statements appellant made about her being scared to leave B.G. with his father, Joe Franks. During the visit, appellant admitted saying that Franks picked up B.G. and "screamed and yelled into his face until the point that he turns red" and said "[y]our mother loves you more than me; but I love her more than you." However, she asserted that the workers "took it out of context." Additionally, appellant tested positive for "Amp; Bup and Meth." Appellant stated that it was a false positive due to her Adderall medication, but she did not elect to contest the results.
Appellant then made some calls after which Franks entered the home and an altercation between Franks and the FSWs began. The FSWs called 911 and while they were trying to get to safety outside the home, appellant got in a vehicle with B.G. and left. When appellant left, she left her urine sample in the home out of her sight, so the sample was not able to be contested. Two FSWs followed appellant for about two miles before she returned to the home and went inside. Appellant did not have a valid driver's license and B.G. was not in a car seat. An Officer Baldwin was at the home when they returned. Unable to get Franks to calm down, to persuade appellant to come out of the house, or to get the FSWs into the home, Officer Baldwin called for assistance, and Sergeant Page arrived shortly thereafter.
The Arkansas Department of Human Services (DHS) filed a petition for ex parte emergency custody and dependency neglect on September 20, 2017, alleging that B.G. was dependent neglected as a result of neglect and parental unfitness. An ex parte order granting the petition was entered on September 21, 2017.
A probable-cause order was entered on September 28, 2017. It noted that the parents *16 stipulated to the existence of probable cause for B.G.'s removal. DHS was ordered to arrange one hour of supervised visitation three times a week and two hours of supervised visitation on Saturday at the discretion of the foster parents, who were to supervise the visitation "within sight and sound[.]" Appellant was ordered to participate in a number of services at DHS's expense, including but not limited to individual and family counseling; and random drug screens. She was also ordered to remain drug free; complete a drug-and-alcohol assessment, following its recommendations; and maintain stable housing and stable income. A CASA volunteer was appointed to the case as well. Chris and Leslie Schmeckenbecher were present-as they would be at nearly all future hearings-and identified as "aunt/uncle foster parents."[3]
The circuit court entered an adjudication order on November 1, 2017. Therein, the circuit court noted that this was not the family's first contact with DHS as there had been referrals for "Neglect-Newborn illegal substance" against appellant that resulted in a protective-services case that was still open when the seventy-two-hour hold was taken. The circuit court found by a preponderance of the evidence that B.G. was dependent-neglected specifically due to failure to protect and drug use. The goal of the case was reunification.
In its January 30, 2018 review order, the goal of the case was still reunification, but the concurrent goal of relative placement was added. DHS was found to have made reasonable efforts to provide services and finalized the permanency plan to achieve the goal.[4] In addition to its previously ordered services, the circuit court made the following specific orders:
8. The parents are ordered to cooperate with [DHS] and follow the case plan. The parents will not use or possess controlled substances which are not prescribed to them, are subject to random drug screens and will provide a proper sample when requested to do so, and shall obtain a drug/alcohol assessment and follow its recommendations. The parents shall submit to a hair follicle drug screen and the request of [DHS]. Willful failure to obey this court's orders is punishable, upon a finding of contempt, by fine, imprisonment, both, or other sanctions imposed by the court.
9. Further Order: Both parents shall take another hair follicle test. Pending the results of the hair follicle test, the Court then shall make a decision to increase visitation. Both parents are to comply with the Orders of the Case Plan including the outpatient drug treatment.
In its May 1, 2018 review order, the goal of the case remained the same, and supervised visitation was increased to two hours per visit, three times a week.[5] Visitation was to be supervised by DHS.[6] Appellant was ordered to complete another drug and alcohol assessment and submit to a nail drug test, the latter of which DHS was ordered to make a referral for within ten days of the hearing. Appellant was also ordered to sign a medical release for her medicine management.
*17 In the circuit court's review order entered August 1, 2018, the goal of the case and the scheduled visitation remained the same. DHS was ordered to do weekly random drug and alcohol screens on appellant. Furthermore, appellant was ordered to "redo all [her] drug and alcohol class from RCA that Mr. Green was associated with including assessment. All individual/group class shall not include Mr. Green." There appeared to have been some romantic involvement between appellant and Zack Green, who was also the drug counselor for both her and Franks.[7]
DHS and B.G.'s attorney ad litem filed a joint petition to terminate appellant's parental rights on September 6, 2018, citing the following as grounds for termination:
1. That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent;[8] and
2. That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.[9]
Facts in support of the petition not previously addressed herein were appellant's:
1. missing her first scheduled psychological evaluation, though she eventually completed it;
2. testing positive for amphetamines on her October 2017 hair follicle test while noting that she "usually" tests positive for amphetamines, benzos, and buprenorphine on her drug screen, but had tested positive for methamphetamines at least once on March 22, 2018;
4. April 2018 hair follicle test taken on her own that was positive for methamphetamines and amphetamines, which led to the new drug and alcohol *18 assessment and the court-ordered nail drug test;
5. admitting that Franks was in jail due to an altercation between him and Green, though she denied a relationship with Green, which led to the court's order to retake her RCA counseling classes with a different counselor; and
Despite being so ordered, it was stated that appellant had (1) not obtained an appropriate home, (2) failed to complete her drug-and-alcohol assessment or additional outpatient treatment, and (3) failed to attend AA/NA meetings at the time of the petition. Appellant's actions were characterized as "wholly non-compliant." Accordingly, termination of appellant's parental rights and adoption for B.G. was sought. The petition asserted that adoption was in B.G.'s best interest because he was "healthy and considered highly adoptable due to his young age and lack of disabilities" and because he would be at risk of potential harm if returned to appellant due to "parental unfitness, inability, and unwillingness" to properly care for the child. The circuit court entered a permanency-planning order on September 12, 2018, changing the goal of the case to adoption.
Following a hearing on October 17, 2018, the circuit court entered an order on October 24, 2018, terminating appellant's parental rights to B.G. It found that DHS had proved both grounds asserted, making the following findings:
Specifically, the Court finds that this case started as a protective services case after the mother and child tested positive at the birth, but when the caseworker did a homevisit [sic] the mother tested positive for methamphetamine, then ... the mother took off with the child-so [DHS] had no choice but to bring the child into foster care. The Court finds that anger and drug use by the parents have been a significant factor in this case. The Court believes that both are still a problem. The parents continue to deny drug use in this case even with three positive hair follicle tests. Today the mother would only own up to using THC. The parents were not honest on their drug and alcohol assessments; if the parents had been truthful the department could have helped them more.... The mother has not had employment during the case. She testified that her father pays her bills in exchange for taking him to appointments and cleaning his home. She offered no proof that she has housing since moving out of [Franks's] home several months ago. The mother was ordered to submit to a second drug and alcohol assessment after the second positive hair follicle, but today she says that she was afraid to do the assessment at RCS because of an inappropriate relationship with her drug treatment counselor Zach[10] Green. The Court stated that doesn't make sense because she brought Mr. Green to her visitation with the child and even today said he is her friend. She has tested positive on three hair follicles. She hasn't complied with counseling for some time.
It went on to find that appellant had (1) not remedied the cause for removal, (2) not made substantial, measurable progress, and (3) manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate her circumstances. It found that there was little likelihood that continued services would result in reunification. Finally, it found that adoption *19 was in the B.G.'s best interest as he is "highly adoptable" with no special needs or barriers to adoption and that there was potential harm in returning B.G. to appellant. This timely appeal followed.
The termination of parental rights involves a two-step process in which the circuit court must find that the parent is unfit and that termination is in the child's best interest.[11] An order terminating parental rights must be based on clear and convincing evidence, i.e., proof that will produce in the fact-finder a firm conviction as to the verity of the allegation sought to be established.[12] On appeal, the issue before us is whether the circuit court's finding that the fact was proved by clear and convincing evidence is clearly erroneous.[13] A finding is clearly erroneous when the appellate court is, on the entire evidence, left with a definite and firm conviction that a mistake has been made.[14] In deciding whether a circuit court's finding is clearly erroneous, we give great deference to its superior opportunity to observe the parties and to judge the credibility of witnesses.[15]
The termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents.[16] As a result, there is a heavy burden placed on the party seeking to terminate the relationship.[17] In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration the (1) likelihood that the juvenile will be adopted if the termination petition is granted; and (2) potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent.[18] The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B).[19]
Appellant's first argument on appeal is that there was insufficient evidence to support the grounds asserted in the petition. Regarding the failure-to-remedy ground, she argues that "the evidence presented that [appellant] continued to have a drug problem, that in turn, called into question her ability to protect her child, was equivocal at best." She also argues that DHS failed to meet its duty to engage in a meaningful effort to rehabilitate her.
B.G. was removed from appellant's custody for failure to protect and drug use. As pointed out by DHS, appellant did not complete the recommendations of her first drug-and-alcohol assessment, failed to complete an ordered second drug-and-alcohol assessment, did not attend NA/AA meetings until a month before the termination hearing, tested positive on drug screens, and never admitted that she *20 abused drugs. Appellant's argument asks this court to reweigh the evidence in support of the circuit court's findings. It is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court.[20]
To the extent that she asks this court to credit her recent attendance at NA/AA meetings in support of her argument that she had remedied her drug-use problem, evidence that a parent begins to make improvement as termination becomes more imminent will not outweigh other evidence demonstrating a failure to comply and to remedy the situation that caused the children to be removed in the first place.[21] And to the extent that appellant now argues that DHS failed to make reasonable efforts to assist her, where the circuit court has made findings throughout the case that DHS had provided an appellant with reasonable services, and the appellant fails to object to those findings at the termination hearing, she has waived the issue on appeal.[22] ,[23]
Appellant's second argument on appeal is that the circuit court's finding that termination was in B.G.'s best interest was clearly erroneous. Specifically, she argues that adoption was not the least restrictive alternative given that B.G. was in a relative placement citing Ivers v. Arkansas Department of Human Services[24] and Lively v. Arkansas Department of Human Services .[25] Both Ivers and Lively are distinguishable in that Ivers was reversed due to this court being left with only speculation after removing the alleged ground itself, which was prior to the termination of parental rights to a sibling-a ground not alleged in the case before us-and Lively was reversed because there was no evidence of adoptability, though it is required to be considered in termination cases.
Accordingly, we find no error.
Affirmed.
The parental rights of Joe Franks, father of B.G., were terminated pursuant to the same order; however, he is not a party to this appeal.
This finding was made multiple times throughout the case.
A virtually identical review order was entered on May 2, 2018.
Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) .
Mr. Green's forename is spelled "Zack" throughout the case; however, the circuit court spelled it "Zach" in its termination order.
Id. (citing Hamman v. Ark. Dep't of Human Servs. , 2014 Ark. App. 295, 435 S.W.3d 495 ).
Id.
Id.
Id.
Id.
Id.
DHS need prove only one ground for termination. Martin v. Ark. Dep't of Human Servs. , 2016 Ark. App. 521, at 11, 504 S.W.3d 628, 635. However, this court does note that with regard to the other subsequent-factors ground, appellant again asks for this court to recharacterize testimony and evidence-which this court does not do-and to find that reasonable efforts were not made by DHS-which appellant waived.
Id. , at 10, 378 S.W.3d at 856.
See Foster v. Ark. Dep't of Human Servs. , 2018 Ark. App. 418, at 6, 559 S.W.3d 762, 766.