
SLIP OPINION


Cite as 2017 Ark. App. 503

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-17-422

|  |  |
|---|---|
| | **Opinion Delivered** October 4, 2017 |
| JESSIE BILL ROSS AND KRISTA DENISE JAMESON<br>APPELLANTS | APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17JV-15-115] |
| V. | HONORABLE MICHAEL MEDLOCK, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br>APPELLEES | AFFIRMED AND MOTION TO WITHDRAW GRANTED AS TO ROSS; AFFIRMED AS TO JAMESON |

## N. MARK KLAPPENBACH, Judge

This is an appeal following the order entered on February 21, 2017, by the Crawford County Circuit Court terminating the parental rights of appellants Krista Denise Jameson and Jessie Bill Ross. Krista is the biological mother of a daughter, MR, born in September 2009, and a son, JR, born in October 2008. Jessie had parental rights only as to MR, not JR. Both parents timely appealed the termination of their parental rights. Krista's attorney filed a merit-based brief, asserting that the trial court clearly erred in failing to follow the preferential goals in the permanency-planning statute prior to terminating her parental rights.[1] Jessie's attorney

---

[1]Krista's notice of appeal designated both the September 2016 permanency-planning order and the February 2017 termination-of-parental-rights order. The permanency-planning order was not appealable absent an Ark. R. Civ. P. 54(b) (2016) certificate, and thus finality was reached when parental rights were terminated. We therefore have appellate jurisdiction

filed a no-merit brief and a motion to be relieved as counsel pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6-9(i) (2016). Jessie's attorney asserts that there are no issues of arguable merit to support an appeal of the decision to terminate his parental rights. We affirm the termination of Krista's parental rights to MR and JR. We also affirm the termination of Jessie's parental rights to MR, and his counsel's motion to be relieved is granted.

*Factual History*

MR and JR came into emergency custody of the Department of Human Services (DHS) in April 2015 while the children were residing with their paternal grandmother, Tawana Mitchell, in a trailer in Chester, Arkansas. Officers were present to arrest the grandmother and her boyfriend, Ricky Shaffer. Mitchell had been using methamphetamine, and Shaffer was a felon in possession of a firearm and drugs. The trailer was old, filthy, and had no running water. Five-year-old MR was present, and she was noted to be dirty. Six-year-old JR was at school.

When Krista was called, she told the caseworker that she had put her children with her mother until she could get back on her feet. Krista was living in a small trailer with her boyfriend, but there was not any room for her children. Krista said that she knew her mother used marijuana, but she was unaware of the methamphetamine use. Krista tested positive for

---

over both orders. *See Gyalog v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 302, 461 S.W.3d 734.

SLIP OPINION

marijuana. Krista stated that she had bipolar disorder, depression, and anxiety issues but that she was not on any medication. She admitted having used methamphetamine in the past but said she no longer used it. The children told the caseworker that they did not really see their mother very much; she would visit if she had gas money. Jessie was imprisoned.

In the probable-cause order, the trial court found that Krista had placed her children in an unsafe environment and was unable to properly care for them due to lack of stability. The children were adjudicated dependent–neglected in a June 2015 adjudication hearing, where Krista was found to be unfit and neglectful, having failed to provide stable, safe housing and having inadequately supervised her children. Krista was ordered to obtain safe and appropriate housing, provide proof of sufficient income, attend visitations, attend parenting classes and demonstrate proper parenting skills, comply with random drug screens, submit to a drug/alcohol assessment, cooperate with the case plan, and request any needed transportation from DHS a week in advance.

The matter was reviewed in September 2015. At that point, DNA testing eliminated Jessie as the father of JR, but he was ordered to comply with the case plan as to MR. He remained incarcerated. Krista had partially complied with the case plan by visiting regularly, completing her drug/alcohol assessment, testing negative for drugs, obtaining housing although it needed some work, and cooperating with DHS. She was ordered to complete any recommendations that came from the drug/alcohol assessment, visit regularly, complete parenting classes, obtain sufficient income to support her children, keep DHS informed of her

SLIP OPINION

address and phone number, and follow recommendations about housing.

Another review hearing was conducted in January 2016, and reunification remained the goal. MR and JR were not in the same foster placement because there were no foster homes to take both of them. DHS was found to have made reasonable efforts to provide reunification services. Krista had again partially complied by completing the drug/alcohol assessment and psychological evaluation, testing negative for drugs, obtaining housing, and cooperating with DHS. She was living with David Locklin, but he had a history of a true finding in a child-abuse investigation. If Krista intended to continue living with David, he was ordered to submit to a psychosexual evaluation and follow the recommendations of a therapist. Jessie was incarcerated and had made no contact with DHS in recent months. Both parents were ordered to comply with the case-plan directives.

In April 2016, the first permanency-planning hearing was conducted. Krista was partially complying with the case plan and orders, making some measurable progress, and diligently working toward reunification. The trial court decided to continue the matter for approximately ninety days and advised Krista that she had to make significant, measurable progress during that time or the court would change the goal to adoption by authorizing a petition to terminate parental rights. Although she had completed many services, there remained concerns about the children's safety if placed in her custody, with emphasis on particular concerns about David, the man she was living with. Jessie was incarcerated, but the court ordered that he be brought to the next hearing. MR and JR were not placed together

4

SLIP OPINION

in foster care, although DHS was trying to make that happen.

A second permanency-planning hearing was conducted in September 2016. Krista and Jessie were present. The goal was changed to adoption. The children were still not able to live in the same foster placement because JR was in therapeutic foster care. Evidence revealed that Krista's home was not appropriate for her children due to its condition, its lack of enough space, and its lack of interior doors. A psychological evaluation on David recommended that he have supervised contact with children and that he participate in a sexual-behaviors program. Jessie was noted to be in prison, where he had been for the entire case, and he did not have a definite parole date. Continued compliance with the case plan was ordered.

DHS petitioned to terminate parental rights in November 2016, alleging three statutory grounds against Krista (twelve months out of custody and failure to remedy, subsequent other factors showing inability or indifference to remedy, and aggravated circumstances showing little likelihood of reunification with provision of more services). DHS asserted that Krista had chosen to reside with a sex offender, knowing that it presented a barrier to the safe return of her children. DHS alleged two statutory grounds against Jessie (sentenced to a period of time constituting a substantial period of juvenile's life and aggravated circumstances showing little likelihood of reunification with provision of more services). DHS alleged that Jessie had been incarcerated the entire case, having been convicted of commercial burglary (twenty-year sentence), arson (ten-year sentence with an additional six years suspended), and theft (six-year suspended sentence). DHS asserted that seven-year-old

SLIP OPINION

MR would be an adult before Jessie's entire sentence was completed and that Jessie's criminal history and sentences rendered him incapable of providing a safe home for MR.

The petition was heard in January 2017. The DHS caseworker, K.C. Oliver, testified about the history of this DHS case, noting Krista's partial compliance along the way. Oliver expressed concern that David, "a sex offender," was living in the trailer with Krista; that there were animals that urinated and defecated all over the trailer but the messes went uncleaned; that there was a very bad smell in the trailer; and that Krista on occasion would not answer the trailer door for DHS visits. Oliver stated that the environmental concerns and her living with a sex offender were the big problems. Oliver thought that DHS had tried to work with Krista but it was "not getting us anywhere," the situation was the same, and it was not fair for the children to have to wait. As to Jessie, Oliver stated that Jessie took some classes in prison, but he was just not going to be able to parent MR given his indefinite term of imprisonment.

Oliver testified that MR was bonded with her foster family, was growing and very happy, was doing well in counseling, and was absolutely adoptable. Oliver stated that JR was in good physical health and filling out, a sweet boy, and adoptable. She noted that it was possible for MR and JR to be adopted together and that it would be in their best interest to remain together.

Jessie testified about his criminal history predating his current convictions and sentences. He admitted having prior convictions for failure to appear, burglary, and assault with a deadly weapon; he had served time in an Oklahoma penitentiary. For his current

6

convictions for commercial burglary, arson, and theft, he was imprisoned in Arkansas at the Cummins Unit. He was unsure of MR's birth date and month. Jessie stated, "I've been locked up too long. I've been locked up since they's born." He had taken some classes while in prison, but he did not know when he would be released from prison, although he thought he might get out in 2018 or 2019.[2]

Krista testified, recounting the events surrounding her children coming into DHS's care, in line with the information provided by DHS's affidavit. Krista stated that she completed many services and case-plan orders, such as drug/alcohol classes, a psychological evaluation and a couple of counseling appointments, parenting classes, visits with her children, and steady employment. She acknowledged that David was on the child maltreatment registry, and although he had moved out for a little while, he was back at their trailer on Candlelight Lane in Van Buren. She admittedly "knew all along that he was on the child maltreatment registry for sexual allegations." Krista said that she was trying to find her own apartment in Van Buren. Krista testified that she needed and wanted the counseling, that she paid for the parenting classes due to the delay on DHS's part, that she tried to clean up her home, that she had worked for nine months at Burger King and was anticipating a raise and more hours, and that she had a vehicle, although it had transmission problems. She agreed that nearly two years had passed since her children had gone into DHS custody and that it was

---

[2]Records from the prison indicated that Jessie had been taken into prison in April 2015 and had six disciplinary violations between December 2015 and July 2016.

SLIP OPINION

not okay for them to have to wait on her forever. Krista agreed that if David was not living with her, the animals were not in the trailer, and she had participated more in counseling, the chances to be reunified with her children would have been greater.

The trial court heard arguments of each parent's counsel, resisting the petition to terminate. Krista's attorney asked for another couple of months in order to be promoted at work and to establish her own apartment. Jessie's attorney noted that he had completed some services on his own and needed DHS's help to comply further, asking that the petition be denied. DHS's attorney argued that Jessie had a twenty-year sentence and did not know when he would get out of prison and that Krista simply had not rectified her living situation to provide a safe and stable home for MR and JR. The attorney ad litem echoed DHS's arguments, adding that there were lots of things that Krista could have done but did not do in spite of the trial court's warning at the September 2016 permanency-planning hearing.

The trial court found that DHS had proved its statutory grounds and that the children's best interest was served by termination of parental rights. Both parents appealed. Because each parent has differing arguments and counsel, we address each party's appeal separately.

I. *Krista*

Krista argues that the trial court clearly erred in failing to follow the preferential goals provided by statute regarding the September 2016 permanency-planning hearing, which necessarily affected the decision to terminate her parental rights. Specifically, Krista asserts that at the September 2016 permanency-planning hearing, the trial court should have

SLIP OPINION

permitted her three additional months in which to achieve reunification with her children based on her measurable progress despite DHS's failure to provide the services necessary to help her achieve that goal. Thus, she asserts, this third-ranked preferential goal should have been prioritized over the fourth-ranked preferential goal of adoption. DHS and the attorney ad litem assert that because Krista does not specifically attack the order terminating her parental rights, any decision at the permanency-planning stage is rendered moot. Furthermore, they argue that the trial court did not clearly err, particularly where at termination she asked for even more time. We affirm.

On appeal from a permanency-planning order, we review findings in dependency-neglect proceedings de novo, but the trial court's findings will not be reversed unless the findings are clearly erroneous. *Ellis v. Ark. Dep't of Human Servs.*, 2016 Ark. 441, 505 S.W.3d 678. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* While we give due deference to the trial court's determination of the credibility of the witnesses and the weight to be given their testimony, the circuit court's conclusions of law are given no deference. *Adkins v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 229, 518 S.W.3d 746.

Arkansas Code Annotated section 9-27-338(a)(1) (Repl. 2015) states that a permanency-planning hearing shall be held to finalize a permanency plan for the juvenile. Subsection (c) provides that at the permanency-planning hearing, based on the facts of the

SLIP OPINION

case, the circuit court shall enter one permanency goal in accordance with the best interest, health, and safety of the juvenile. The permanency goals are listed in order of preference in subsection (c). The first two preferences concern returning the juvenile to a fit parent at that time or returning the juvenile to the person from whom the juvenile was taken. Those two goals are not applicable here. The third preference permits the authorization of a plan to place custody of the juvenile with a parent, guardian, or custodian, but only if the court finds that the parent, guardian, or custodian is complying with the established case plan and orders of the court, making significant measurable progress toward achieving the goals established in the case plan, and diligently working toward reunification or placement in the home of the parent, guardian, or custodian. The burden is on the parent, guardian, or custodian to demonstrate genuine, sustainable investment in completing the requirements of the case plan and following the orders of the court in order to authorize a plan to return to or be placed in the home as the permanency goal. This goal is contingent on placing the juvenile in the home within a time frame consistent with the juvenile's developmental needs but no later than three months from the date of the permanency-planning hearing. The fourth preference is to authorize a plan for adoption with the department filing a petition for termination of parental rights, with certain exceptions not applicable here. *See Bean v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 77, 513 S.W.3d 859.

Krista argues that it was error to not give her three more months from September 2016 in which to become ready to have her children return safely to her custody and that changing

SLIP OPINION

the goal to adoption at that time necessitates reversal. She asserts that her improvements between that hearing and the termination hearing would be given no weight, making termination effectively a foregone conclusion. We disagree. While "eleventh hour" participation need not be a bar to termination, the trial court is to rely on the record of the parent's compliance in the entire dependency-neglect case and evidence presented at the termination hearing in making its decision whether it is in the juvenile's best interest to terminate parental rights. *See* Ark. Code Ann. § 9-27-341(4)(A) & (4)(B). The trial court here announced at the closing of the September 2016 permanency-planning hearing that it would "certainly consider any improvements that we have at that point [at the termination hearing] and gladly, you know, review those and take up whether there's been any progress and consider that."

Moreover, the goal was not changed to adoption until the second permanency-planning hearing. Krista had an earlier permanency-planning hearing in April 2016 at which time the trial court continued the matter for approximately ninety days to see if Krista could make and sustain measurable, significant progress so that the goal would not be changed. At that point, the children had already been out of her custody for a year. At the second permanency-planning hearing in September 2016, the goal was changed to adoption. Nonetheless, the termination hearing was not conducted until mid-January 2017, nearly exactly four months after the second permanency-planning hearing. By virtue of the trial court's directives in the second permanency-planning order, Krista was to continue working

11

the case plan, and DHS was ordered to continue providing referrals for services and to continue with visitations as outlined in the case plan. She received the ultimate relief she requested, which was three more months to work toward reunification, as termination of her parental rights was not a foregone conclusion.

Furthermore, at the conclusion of the termination hearing, Krista's attorney asked that Krista be given "another couple of months" to see if she could achieve independent appropriate housing and a full-time job. Thus, even after having had four more months following the second permanency-planning hearing, Krista was admittedly still not ready to have her children returned to her custody. At termination, MR and JR had been out of Krista's custody for nearly two years. Her attorney's request for even more time at that point nullifies her contention that error occurred in changing the goal to adoption in September 2016 and not affording her "three additional months within which to achieve reunification." The trial court did not clearly err in changing the goal at the September 2016 permanency-planning hearing and did not clearly err in terminating her parental rights.

## II. *Jessie*

With regard to Jessie, his attorney filed a no-merit brief and a motion to be relieved with regard to the termination-of-parental-rights order. Jessie filed pro se points for reversal in which he contends that DHS should have made an effort to find a relative placement prior to terminating his parental rights. DHS responds that this issue was not raised before the trial court and is thus waived on appeal and, in the alternative, that this is a matter regarding the

children's best interest that is adequately explained to have no merit by his attorney.

First, the law on termination of parental rights is well settled. The termination of parental rights involves a two-step process in which the trial court must find that the parent is unfit and that termination is in the child's best interest. *Murray v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 431, at 6, 429 S.W.3d 288, 292. An order terminating parental rights must be based on clear and convincing evidence, i.e., proof that will produce in the fact finder a firm conviction as to the verity of the allegation sought to be established. *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, 435 S.W.3d 495. On appeal, the issue before us is whether the trial court's finding that the fact was proved by clear and convincing evidence is clearly erroneous. *Id*. A finding is clearly erroneous when the appellate court is, on the entire evidence, left with a definite and firm conviction that a mistake has been made. *Id*. In deciding whether a trial court's finding is clearly erroneous, we give great deference to its superior opportunity to observe the parties and to judge the credibility of witnesses. *Id*.

In determining the best interest of the juvenile, a trial court must take into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *Myers v. Ark. Dep't of Human Servs.*, 2011 Ark. 182, 380 S.W.3d 906. In considering the best interest of the child, there is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all the factors, the evidence must be clear and

SLIP OPINION

convincing that termination is in the best interest of the child. *Collins v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 90.

The intent behind the termination–of–parental–rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27–341(a)(3). Courts will not enforce parental rights to the detriment of the well-being of the child. *Villaros v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 399, 500 S.W.3d 763; *McElwee v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 214, 489 S.W.3d 704. This court is not to act as a "super factfinder," substituting its own judgment or second-guessing the credibility determinations of the court; we reverse only in those cases where a definite mistake has occurred. *Harris v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 508, 470 S.W.3d 316.

In this case, the statutory grounds alleged by DHS against Jessie that were found to have been proved were that (1) Jessie had been sentenced to a period of time that would constitute a substantial period of MR's life, and (2) Jessie had subjected MR to aggravated circumstances in that there was little likelihood that additional services would result in successful reunification. *See* Ark. Code Ann. § 9-27–341(b)(3)(B)(viii) and (b)(3)(B)(ix). Counsel adequately addresses the sufficiency of the evidence on the first alleged statutory ground. Jessie has admittedly been in prison essentially all of MR's life, and his current prison

sentences are lengthy. The statutory ground requires proof that the parent has been sentenced in a criminal proceeding for a period that would constitute a substantial period of the child's life. Ark. Code Ann. § 9-27-341(b)(3)(B)(viii). Thus, it is the sentence that controls, not the possibility of early release. *See Woodward v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 91, 513 S.W.3d 284 (ten-year sentence regarding nine-year-old child constitutes substantial period in child's life). A twenty-year sentence is a substantial period of MR's life, given that she was seven years old when this petition was filed and heard. *Compare Fields v. Ark. Dep't of Human Servs.*, 104 Ark. App. 37, 289 S.W.3d 134 (2008) (ten-year concurrent prison sentences, child ten months old); *Moore v. Ark. Dep't of Human Servs.*, 333 Ark. 288, 969 S.W.2d 186 (1998) (twenty-eight-year prison sentence, child one year old). Proof of only one statutory ground is necessary to support termination of parental rights.

The fact that Jessie is currently incarcerated makes it impossible for MR to be safely placed in his custody and clearly constitutes potential harm to MR since Jessie is unable to provide housing or any stability whatsoever. *See Woodward*, *supra*. There was uncontested evidence that MR was a happy, healthy, growing girl with no obvious impediments to adoption. The caseworker believed that she was "absolutely" adoptable. Thus, the trial court gave consideration to both the potential-harm and adoptability factors that are part of the best-interest analysis. *See id.* In summary, we agree with appellate counsel that there could be no issue of arguable merit raised on appeal of the statutory grounds to terminate Jessie's parental rights to MR.

As counsel notes, there was only one other adverse ruling to Jessie during the termination hearing, that being when the attorney ad litem was permitted to ask the caseworker what type of potential harm there was in giving Jessie custody of MR. Jessie's attorney objected that this would call for speculation. The attorney ad litem agreed that asking about potential harm necessarily required speculation about the future, but it was a statutory element required to be proved. The trial court allowed it. The caseworker testified that the potential harm was that Jessie, being incarcerated, had no safe, stable home for MR.

There could be no issue of arguable merit to raise on appeal of this evidentiary ruling. The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918. Potential harm must be viewed in broad terms, including the harm the child suffers from the lack of stability in a permanent home. *Martin v. Ark. Dep't of Human Servs.*, 2017 Ark. 115, 515 S.W.3d 599. "Potential" necessarily means that the answer looks to future possibilities, and potential harm was required to be considered. Moreover, it was undisputed that Jessie had no home to provide for MR while he was incarcerated; thus, there could be no resulting prejudice in permitting the caseworker to testify about potential harm.

In his pro se points for reversal, Jessie does not argue that termination of his parental rights was in error. Instead, he contends that the trial court erred in not giving his immediate

family the chance to gain custody of MR.[3]  To the extent that Jessie is contesting the sufficiency of the evidence for termination, the trial court's decision to terminate parental rights was not clearly erroneous based on the evidence that was before the court, and Jessie's counsel has adequately addressed the sufficiency-of-the-evidence argument in the no-merit brief. Additionally, Jessie's relative-custody argument lacks merit. The children were taken initially from his mother due to her drug use and arrest; no other paternal family members appeared in this DHS case; and Jessie did not raise this issue to the trial court prior to termination of his parental rights.  Furthermore, the trial court's order does not preclude a family member from seeking MR's adoption.

Thus, having carefully examined the record and the brief presented to us, we find that Jessie's counsel has complied with the requirements established by the Arkansas Supreme Court for no-merit appeals in termination cases, and we conclude that the appeal is wholly without merit. Accordingly, we affirm the order terminating Jessie's parental rights to MR and grant counsel's motion to withdraw. *See Matlock v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 184, 458 S.W.3d 253.

In conclusion, we affirm the termination of Jessie's parental rights to MR, and his counsel's motion to be relieved is granted. We affirm the termination of Krista's parental rights to MR and JR.

---

[3]Although Jessie presents his pro se points with regard to both children, his parental rights were terminated only as to MR.

SLIP OPINION

Affirmed and motion to withdraw granted as to Jessie Ross; affirmed as to Krista Jameson.

GLADWIN and HARRISON, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant Jessie Ross.

*Lightle, Raney, Streit & Streit, LLP*, by: *Jonathan R. Streit*, for appellant Krista Jameson.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor children.