Cite as 2019 Ark. App. 411

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-19-335

| | |
|---|---|
| | **Opinion Delivered** September 25, 2019 |
| TREASURE MORRIS | |
| APPELLANT | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT |
| V. | [NO. 23JV-17-175] |
| | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE DAVID M. CLARK, JUDGE |
| APPELLEES | AFFIRMED |

### N. MARK KLAPPENBACH, Judge

This appeal arises from the circuit court's January 14, 2019 order terminating the parental rights of Treasure Morris to her four-year-old son, TM, and two-year-old son, JM. The children's father, Franklin Morris, also had his parental rights terminated, but he is not a party to this appeal. The children were removed from the home by the Arkansas Department of Human Services (DHS) in June 2017 due to environmental neglect. The circuit court found that after more than a year in which to correct the conditions and demonstrate that she could provide a safe environment for her sons, Morris had failed to do so. The circuit court also found that it was in the best interest of the boys to terminate her parental rights. Morris appeals these findings. We affirm.

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. *Houseman v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 227, 491 S.W.3d 153. The first step requires proof

of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juvenile will be adopted and of the potential harm caused by returning custody of the child to the parent. *Id*. We review termination-of-parental-rights cases de novo. *Id*. The grounds for termination of parental rights must be proved by clear and convincing evidence, which is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Id*. When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. In resolving the clearly erroneous question, the reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses. *Id*.

The facts in this case are not in material dispute. This appeal concerns the conclusions to be drawn from these facts. From August 2016 (when the younger child JM was born) through April 2017, DHS had an open protective-services case concerning environmental neglect in the home. DHS intervened due to "trash everywhere" including dirty diapers, dog and cat feces, and exposed electrical cords in the home. DHS provided the family services to avoid having to take the boys into custody, but those efforts ultimately did not work.

DHS checked on the family in June 2017 following a hotline call. DHS found the family home to be in deplorable condition, with piles of trash, dirty diapers, old food, empty

cans and bottles, bugs, feces, piles of clothes, and other items covering the floors throughout the house. The refrigerator was filthy. There were cigarette butts and other hazardous items within the children's reach.

Over the next month, the parents cleaned up the house, so in mid-July 2017, the circuit court permitted the boys to go home for a trial placement. By mid-August 2017, however, the DHS caseworker visited the family and found the home and children in terrible condition. Both boys had bug bites on their bodies; one boy had bruising on his eye and back; the other boy had a rash around his genitals. There was urine and feces in the children's beds, there were exposed electrical cords "all over the place," and there were piles of things inside and outside the home. The boys were taken back into DHS custody. In September 2017, the boys were found to be dependent-neglected.

Over the following months, there continued to be environmental issues with the home. Morris was a stay-at-home mother with no job outside the home, and DHS provided the family with services, including homemaker services and chore lists; cash assistance for pest control to address an extreme roach infestation; parenting classes; budgeting assistance; cleaning supplies; and counseling. Despite these services, the parents often permitted the home to be cluttered, filthy, and dangerous to children. The DHS case worker observed feces and urine on the floor; trash, laundry, and dishes throughout the house; and wires, chemicals, tools, and cigarette butts that the children could access. Although there were occasions when the parents would clean up the home, they would inevitably permit the home to go back to a state of squalor unfit for children, regardless of whether DHS conducted planned or surprise visits. The parents did not consistently clean up urine and

3

feces on the floor in the house left by their pets (a cat, a litter of kittens, and a puppy), which was exacerbated by their getting two additional puppies during this open DHS case. The caseworker told the parents over and over not to leave food out for days, not to leave cigarette butts on the table, and not to leave extension cords out in the open, all of which were dangerous because the boys could put those things in their mouths.

The termination hearing was conducted in December 2018, approximately a year and a half after the boys initially went into DHS's custody. The parents moved to a different home about a month before the termination hearing, and Morris was pregnant with another child. Photographs taken by DHS just days before the termination hearing showed that the home had pet urine and feces in various places on the floor, there was clothing and other items piled up around the house, the stove top was encrusted with what appeared to be food materials, and there was dark mold in and around the refrigerator/freezer.

The boys were doing well in their foster home, and their foster family was interested in adopting them. JM had a digestive-system disorder that required a strict dietary regimen, and he was in speech therapy and swallow therapy. TM had allergies that were treated with medications. Otherwise, the boys were both happy and thriving in their foster placement.

The father agreed that the home they had in Conway was messy, that initially things were not acceptable for his boys, and that he and the mother would "go backward and forward" with keeping it clean. He said that they had moved to North Little Rock in November 2018, that they had improved in keeping their home clean and safe, and that the new home they were leasing was a better place. He said that he could have done better in the beginning of this case but that he was currently doing his best.

Morris testified that she knew the safety hazards and cleanliness issues had to be fixed, and they fixed them. Although she recognized that she did not show commitment to cleanliness in the old home, she did in the new place. She had recent photographs of the new house to show the court, although she acknowledged that when DHS took recent photographs on "that one unlucky day," the North Little Rock home did not look so good.

The circuit court found the DHS caseworker and the CASA advocate to be credible. Their testimony supports the facts as heretofore described. They both recommended that parental rights be terminated.

The circuit court found that the parents had the ability to get the home clean and did so at times, but they failed to demonstrate that they were capable of keeping the home clean, particularly for these two young children. The circuit court stated that it was not about one moment in time or one photograph but rather about the bigger collective picture that demonstrated the parents being incapable of keeping their sons clean and healthy and incapable of providing a clean, safe home for the children. The circuit court thus found that DHS had proved the "failure to remedy" statutory ground. In finding termination of parental rights to be in these children's best interest, the circuit court found (1) that it was likely that the boys would be adopted, noting that the testimony was that the foster parents were interested in adopting them and (2) that the persistent environmental neglect in the home posed a potential harm to the boys if returned to Morris.

Morris first argues that the circuit court clearly erred in finding that DHS presented clear and convincing evidence of statutory grounds for termination. DHS alleged, and the

5

circuit court found that DHS had proved, the "failure to remedy" statutory ground found in Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2017):

> That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Morris does not contest that the boys had been out of her custody for well over a year nor does she contest that DHS provided meaningful rehabilitative services to her. Morris contends that she remedied the conditions that caused removal of her children. Specifically, Morris asserts that she moved to a different residence to improve the conditions, that her boys were never directly or indirectly harmed due to the home environment, and that her progress warranted sustaining her parental rights. The children's attorney ad litem and DHS assert that the circuit court correctly found that although there were times when Morris tried to clean up the home, her efforts were never sustained, and instead the home devolved into squalor unfit for her sons.

Morris describes other termination-of-parental-rights appeals in which there was environmental neglect and argues that her situation demonstrates that her efforts were laudable, sustainable, and worth continuing the parental bond. She argues that in the cases in which termination was affirmed, the issues there were more egregious, and the parents failed to make any significant or sustained progress. *E.g.*, *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001); *Gray v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 24; *Browning v. Ark. Dep't of Human Servs.*, 85 Ark. App. 495, 523, 157 S.W.3d 540, 559 (2004). Morris also likens her case to *Trout v. Arkansas Department of Human Services*, 84

6

Ark. App. 446, 146 S.W.3d 895 (2004), in which we reversed the termination of parental rights because Trout showed substantial improvements prior to the termination hearing. Notably, though, our supreme court took *Trout* on review and reversed our decision, ultimately affirming the circuit court's decision to terminate parental rights. *Trout v. Ark. Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004). Our review of this record does not bear out Morris's contention that she remedied the environmental hazards in a sustained and meaningful way to demonstrate that she could provide a safe environment for her children. Morris's home environment, even the most recent residence, was found to be in an unkempt and unclean condition in the days leading up to the termination hearing.

What Morris asks us to do is to reweigh the evidence in a manner more favorable to her, which we are not permitted to do on appeal. *Glover v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 278, 577 S.W.3d 13. We have reviewed the evidence de novo, and we are not left with a definite and firm conviction that the circuit court clearly erred in finding that DHS proved the "failure to remedy" statutory ground.

As to the best interest of these children, Morris does not contest that the boys are adoptable. Instead, Morris argues that DHS failed to prove potential harm to the children if returned to her because the children "were never hurt prior to removal" and that it was completely speculative to assert that they might be harmed in the family home. We disagree.

The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Ross v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 503, 529 S.W.3d 692. Potential harm must be viewed in broad terms, and "potential" necessarily means that the court is required to look to future possibilities. *Id.* Moreover, in

considering the best interest of the child, there is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all the factors, the evidence must be clear and convincing that termination is in the best interest of the child. *Id.*

Environmental neglect persisted in this case. Morris permitted environmental hazards to be in and around the home even though DHS had provided rehabilitative services to her for well over a year. Even before this case was initiated, DHS had provided the family with months of supportive services. In light of this evidence, the circuit court undoubtedly considered the potential harm to TM and JM if returned to their mother's custody. The circuit court's findings are sufficiently supported by this record. Consequently, Morris has failed to establish clear error in the circuit court's best-interest finding.

Affirmed.

HIXSON and BROWN, JJ., agree.

*Dusti Standridge*, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.