Cite as 2023 Ark. App. 561

# ARKANSAS COURT OF APPEALS
### DIVISION II
#### No. CV-23-333

DAVID MILLER AND DELISSA
JOHNSON

APPELLANTS

V.

ARKANSAS DEPARTMENT OF
HUMAN SERVICES AND MINOR
CHILD

APPELLEES

Opinion Delivered  December 6, 2023

APPEAL FROM THE WHITE COUNTY
CIRCUIT COURT
[NO. 73JV-21-110]

HONORABLE MARK PATE, JUDGE

AFFIRMED; MOTION TO WITHDRAW
GRANTED

**RITA W. GRUBER, Judge**

This is an appeal following an order of the White County Circuit Court terminating

the parental rights of Delissa Johnson and David Miller. Delissa's attorney has filed a no-

merit brief and a motion to be relieved as counsel pursuant to *Linker–Flores v. Arkansas*

*Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme

Court Rule 6-9(j) (2022), asserting that there are no issues of arguable merit to support an

appeal of the decision to terminate her parental rights.[1]  David filed a merit brief challenging

---

[1]The clerk of this court attempted to deliver to Delissa a packet containing a copy of
counsel's brief and motion to withdraw and advising her of her right to file pro se points for
reversal; however, the packet was returned and marked as "return to sender/unable to
forward." The clerk's office contacted Delissa's counsel, who informed that Delissa's last
known address was a prison address, but at the time of mailing, Delissa had been paroled
and had since absconded.

only the statutory grounds to support the termination. We affirm the termination of parental rights as to both parents and grant counsel's motion to withdraw.

On May 5, 2021, the Arkansas Department of Human Services (DHS) filed a petition for ex parte emergency custody and dependency-neglect regarding MC, who was eleven years old. It alleged that both parents were incarcerated—Delissa at the White County Detention Center and David at the Arkansas Department of Correction (ADC). The affidavit in support of the petition explained that MC's guardians, Betty and Lonnie Randall, informed DHS that they could no longer have MC in their home. Because MC had no place to go, DHS exercised an emergency hold on May 3.

An ex parte order for emergency custody was entered on May 6 followed by a probable-cause order on May 11, which found that probable cause existed and continued to exist such that MC would remain in DHS custody.[2] A June 3 adjudication order provided that the matter was "uncontroverted" and that MC was dependent-neglected due to the parents' incarceration and the Randalls' unwillingness to continue as MC's guardians. The court also found that David is MC's "presumed father" because he signed an acknowledgement of paternity at MC's birth. The court set the goal of reunification or placement with an appropriate parent. The parents were ordered to cooperate with DHS, follow the case plan, and refrain from using or possessing controlled substances. The order

---

[2]The order also granted the guardians' request to be dismissed from the case. However, there is no indication in the record that the guardianship was terminated, which would be necessary to clear MC for adoption.

provided that they would be subject to random drug-and-alcohol screens once they were no longer incarcerated. The parents were required to obtain drug-and-alcohol assessments and follow the recommendations; complete psychological evaluations; complete parenting classes; and obtain and maintain appropriate housing and income once released from incarceration. Visitation was at the discretion of DHS.

In a September 24 review order, the court continued the goal of reunification, and MC remained in DHS custody. The order provided that DHS had complied with the case plan and orders of the court, specifically noting that DHS "provided, referred, or otherwise offered: foster care; foster home visits; case management, advocacy, staffings, referrals for services, and visitation once the parents are able to do so." The court found that DHS had made reasonable efforts to provide family services and finalize a permanency plan. Delissa was found to have partially complied with the case plan because she had completed rehabilitation at Phoenix, attended counseling, and was employed, but she was on absconding status and had no residence of her own. David remained incarcerated, but the order indicated he may be paroled in November. The court found the parents had made some progress toward the goals of the case.

A second review order was entered on January 20, 2022. The order provided that Delissa was out of jail but had an outstanding arrest warrant, and David remained incarcerated. The goal of the case remained unchanged. The court found that Delissa had partially complied with the case plan, making the same findings as the first review order and

adding that Delissa had not attended outpatient treatment as recommended. The court made the same reasonable-efforts finding as the previous order.

At the time of the permanency-planning hearing on April 28, David remained incarcerated. The court found that the safety concerns that prevented a trial placement or return of custody included the following: MC's guardians were no longer involved in the case; Delissa lived with her mother-in-law, left inpatient drug treatment twice without successful completion, was not maintaining contact with DHS, had not provided proof of counseling or employment, provided invalid samples for drug testing on 02/14/22 and 03/4/22, and had absconded from probation; and David remained incarcerated with a requirement to complete a nine-month therapeutic program. The court continued the previous goal, found that DHS had complied with the case plan, and made a reasonable-efforts finding, but the court found that the parents had demonstrated little progress toward the goals of the case plan.

In the July 28 fifteen-month permanency-planning review order, the circuit court found that the same safety concerns remained that prevented return of MC to the parents and changed the goal of the case to adoption. The court found that Delissa had not complied with the case plan and court orders, specifying that her whereabouts were unknown; she left inpatient drug treatment twice without successful completion; she was not maintaining contact with DHS; she had not provided proof of counseling or employment; she had not completed the psychological evaluation or parenting education; and she admitted using methamphetamine on 06/27/22. Regarding David, the court found that he remained

4

incarcerated and needed to complete a nine-month therapeutic program. Again, the court found that DHS had complied with the case plan and made the same reasonable-efforts finding.

On September 20, DHS filed a petition for termination of parental rights based on the following grounds: failure to remedy by both the custodial parent (Ark. Code. Ann. § 9-27-341(b)(3)(B)(i)(*a*)) and noncustodial parent (Ark. Code. Ann. § 9-27-341(b)(3)(B)(i)(*b*)); failure to provide significant material support or failure to maintain contact (Ark. Code. Ann. § 9-27-341(b)(3)(B)(ii)(*a*)); and subsequent factors (Ark. Code. Ann. § 9-27-341(b)(3)(B)(vii)(*a*)). In a September 26 review order, the circuit court continued the goal of termination and adoption. David remained incarcerated, and Delissa had been released from the White County Detention Center, but her whereabouts were unknown. The DHS court report, the CASA report, and Delissa's 09/14/22 drug test, which was positive for methamphetamine and amphetamine, were entered into evidence. The same reasonable-efforts finding was made.

A termination hearing took place on January 19, 2023. David attended and was represented by counsel; Delissa was represented by counsel, who stated that Delissa had notice of the hearing but informed counsel that she would not be present. Both parents were present on February 9 when the circuit court announced its decision.

DHS caseworker Jessica Rhoades testified that MC had come into DHS custody after his guardians did not pick him up from an inpatient hospital placement. Neither parent had custody of MC at that time. Rhoades testified that MC had eleven placements during the

5

case, explaining that he would act out, get into altercations with his placements, and destroy property. At the time of the termination hearing, MC had been in a therapeutic foster home for ten months, which had been his longest placement. He was doing well, had good grades, was on the basketball team, and was using the techniques he learned in counseling. When asked what was different with MC now than in the previous placements, Rhoades stated that he was in a stable environment and able to express how he feels and work through his anger.

Rhoades testified about the services provided to both parents. For Delissa, DHS had made referrals for a psychological evaluation; provided visitation and transportation; and conducted home visits, drug screens, and staffings. Despite referrals, Delissa had not completed the psychological evaluation or established consistent mental-health treatment, and had only completed four of twelve parenting classes. Delissa had lived with numerous people throughout the case but had been living with her boyfriend since October 2022, which was her most consistent residence. Delissa cleaned homes, but DHS could not confirm her employment because she was paid in cash and had no proof that her income was sufficient to support herself and MC. Rhoades testified that Delissa had entered substance-abuse treatment multiple times but never completed a program, and she did not participate in the referred outpatient treatment after leaving inpatient treatment. Rhoades said that Delissa tested positive for methamphetamine on 10/08/2021, 01/13/22, and 02/14/22 and admitted using methamphetamine prior to her June 2022 arrest. Rhoades had attempted to screen her in December 2022, but Delissa could not provide a sample. Rhoades

stated that Delissa had not demonstrated a consistent period of sobriety and would have to complete substance-abuse treatment to be considered as a placement for MC.

Rhoades stated that Delissa had been in jail at times during the case but was currently on absconding status because she had failed to report to her parole officer and had an active warrant. Rhoades expressed that MC was in DHS custody due to his parents' incarceration and nothing had changed, adding that it was likely that Delissa would be in jail again because of the active warrant. Rhoades said that Delissa attended twenty of forty visits, which did not go well because there was "a lot of anger and feelings" expressed during the visits, and they ceased in September 2022 because MC was unwilling to participate in visitation. Roades did not think Delissa has a good bond with MC.

Rhoades testified that David had been incarcerated throughout the entirety of the case. He had completed parenting, substance-abuse, and anger-management classes while incarcerated. In December 2022, David had been in "trouble" for "being under the influence" while incarcerated. As a result, Rhoades did not think he had fully benefited from the substance-abuse program he participated in while incarcerated. Due to his incarceration, DHS was unable to conduct home visits, drug screens, or family counseling. Rhoades testified that David participated in staffings where the services he needed were discussed. She did not contact the ADC to determine if David could receive counseling or complete the psychological examination while incarcerated. Rhoades said that David sent letters to MC, but MC never wrote back. David also sent a letter to Rhoades asking what he could do and inquiring about MC and had made several requests for photos. Although the possibility

7

of visitation was discussed in staffings and with the therapist, it was not offered because MC refused to visit with David. Rhoades said that she was neither aware of any providers used by DHS that provided services in prison nor did David suggest any during staffings or request that she look for such providers.

Rhoades's concerns in reunifying MC with Delissa included her ability to provide a stable, drug-free environment; to remain out of jail; and to be a consistently appropriate parent. For David, the concern was his incarceration. Rhoades testified that the parents had not made any progress, had not been diligently working toward reunification, and had not shown a genuine sustainable interest in complying with the case plan. Rhoades said that Delissa had been given several chances to complete services but failed to do so. Rhoades indicated that because David was incarcerated there was only "so much he can show the Department due to that status and not knowing when he's going to be released." At the time of the hearing, Rhoades had not been able to obtain David's release date. Before placing MC with David once released, DHS would require him to obtain suitable housing, employment, and reliable transportation; maintain a drug-free environment; and participate in family counseling, parenting classes, and visitation. When asked how long that would take, Rhoades indicated that was "a big question mark" because there were so many uncontrollable factors, including that MC and David would have to establish a relationship in family counseling. Even if David were released soon, Rhoades could not say that placement with him would occur.

Rhoades testified that MC could not be placed with either parent that day and that the parents had not remedied the conditions that caused removal. On the basis of her experience with MC, Rhoades testified that the uncertainty of what was going to happen to him and not being able to plan for his future would cause him to regress in his anger-management progress. She was not aware of any factors that would prohibit or prolong the adoption process. When asked what factors were in favor of a successful adoption for MC, Rhoades said that he is a "great kid," noting that he is funny, intelligent, and determined and has been able to find joy in basketball and other things to make himself a better person. With respect to potential harm, Rhoades indicated that MC would be at risk of harm to be around caregivers who have a substance-abuse problem, who are in and out of jail, and who have not been a consistent part of his life, all of which could cause MC to return to DHS custody. With the case having been open for over fifteen months, DHS recommended that termination and adoption would be in MC's best interest, specifically mentioning that more time for the parents would not be in MC's best interest because he needs stability and consistency to move forward with his life and plan for his future.

Katherine Hudson, a DHS program assistant, provided visitation services and supervised visits between MC and Delissa. Hudson stated that Delissa missed about half of the forty visits due to a variety of reasons, including Delissa's being incarcerated, attending rehab, oversleeping, not showing, or being "MIA." While Hudson thought that MC likely had a close bond with Delissa when he was younger, their relationship had become confrontational at the point she met them. She said that MC had "no faith in his mom" and

9

was "constantly doubting that she would ever be able to get him back home." They argued often during visits, and Delissa had good days and bad days in how she handled the confrontation. Hudson indicated that sometimes Delissa's behavior was erratic and seemed to be drug induced. Visitations ceased at MC's request after he had recognized that Delissa was on drugs during the last visit, which resulted in MC's hanging up on the Zoom call. He never requested another visit, though Rhoades spoke to MC's therapist about continuing to schedule visits. Hudson said that not long after the last visit, Delissa was incarcerated for several months, and no progress had ever been made to reestablish a visitation schedule.

Laura Beth Brown, the Court Appointed Special Advocate (CASA) case coordinator, had approved the CASA court report introduced at the hearing. Brown met with MC shortly after the case opened. She testified that that, although he initially had behavioral issues at home and school, MC's behavior improved after he was placed in a therapeutic foster home in April 2022, which provided greater structure and stability. CASA recommended that parental rights be terminated and that MC be adopted. Brown stated that MC is adoptable and described him as a "good kid" who is engaging, pleasant, and intelligent. Brown said that MC does well in school and now gets along well with others. Brown testified that MC has no health concerns and his mental health is stable. She stated that MC has been in care 626 days and deserves permanency.

David testified that he is MC's father and was currently incarcerated. He had asked for and received photos of MC on two occasions but not since communications had broken down toward the end of 2022. David admitted he had tested positive for methamphetamine

on December 6, 2022, while incarcerated at ADC. He stated that a disciplinary action took place on December 28, and he was currently on a thirty-day "refocus." David stated that he completed all the courses offered by the ADC but could not recall when they occurred. Some of the classes, which included anger management, substance abuse, and parenting, had been taken before the case was open. He indicated that if a class had been taken previously, there is a waiting period before it can be taken again.

After closing arguments, the circuit court took the matter under advisement and announced its decision to terminate both parents' rights in court on February 9. In the February 22, 2022 termination order, the circuit court found DHS had proved all four grounds alleged in its petition. The order specifically found as follows:

> It has been over fifteen months since the child was taken into emergency hold and the mother and father remain in and out of jail and incarcerated with no stable residence or income to support the child. The mother has continued to fail drug tests for methamphetamines and has entered at least three drug rehabilitation programs and has failed to complete any of them. She has not maintained consistent contact with the department and has not completed mental health counseling. The mother has been provided services throughout the case, has had ample time and opportunity to remedy the issues that prevent placement of the juvenile in her home and continues to show indifference or inability to remedy said issues. The father is incarcerated at the Arkansas Department of Correction and is expected to be incarcerated for at least several more months. While he did complete some programs while incarcerated, as recently as December 2022, he obtained and used methamphetamines in jail. Visitations have not occurred with either parent due to therapy recommendations and [MC's] desires to not visit with his parents. It is in the best interests of the child to terminate parental rights and change the goal to adoption.

In its best-interest finding, the circuit court found that MC is adoptable and that he would be subject to potential harm because the parents had over fifteen months to get out

11

of prison or jail and establish a stable, suitable residence for MC but had failed to do so. The circuit court noted that Delissa had been in and out of jail the entire case; admitted using methamphetamine in June 2022 and tested positive for methamphetamine in September 2022; had left multiple drug-treatment programs without successful completion; and failed to provide DHS proof of counseling attendance, employment, completion of the psychological evaluation, and completion of parenting classes. The circuit court found that David had been hoping to be paroled since the beginning of the case, and no actual release date had been verified. Even after release, David would need additional compliance and services in order to establish his fitness as a parent. The circuit court also noted that in December 2022, David had obtained and used methamphetamine in prison. The court found that MC's "continued lack of permanency would cause potential harm," and there would be "obvious harm" to MC if placed with either parent at that time. This appeal followed.

We review termination-of-parental-rights cases de novo. *Tribble v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 535, at 2. At least one statutory ground must exist in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2023). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Thomas v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 457, at 4, 610 S.W.3d 688, 691. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly

12

erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Long v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 372, at 16, 675 S.W.3d 158, 169. In determining whether a finding is clearly erroneous, due deference is given to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

I. *No-Merit Brief and Motion to Withdraw Filed by Delissa's Counsel*

Counsel for Delissa correctly asserts that there can be no meritorious challenge to the sufficiency of the evidence supporting the termination of her parental rights. Although the circuit court found multiple statutory grounds to support termination, only one ground is necessary. *Westbrook v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 352, at 3, 584 S.W.3d 258, 261. Counsel focuses on the subsequent-factors ground, which provides that

> other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*). Failure to comply with court orders is a subsequent factor on which termination may be based. *Arnold v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 300, at 11, 578 S.W.3d 329, 336.

The evidence introduced established that Delissa never successfully completed drug treatment and continued to test positive for illegal substances throughout the case. Delissa's failure to complete drug treatment and continuing to test positive for illegal substances

13

support termination under the subsequent-factors ground, and any argument to the contrary would be without merit.

Counsel also adequately explains why the best-interest finding is supported by clear and convincing evidence and that no issue of arguable merit could be asserted on appeal. The caseworker testified that she was not aware of any factors that would prohibit the adoption process for MC. Regarding factors in favor of a successful adoption, Rhoades testified that MC has no health concerns and is a "great child," elaborating that he is funny and intelligent and has been able to find joy in basketball and other things to make himself a better person, despite everything he had been through. The CASA case coordinator said that MC is adoptable and described him as pleasant, engaging, and intelligent. She said he gets along well with others and does well in school. She also stated MC's mental health is stable and there are no health concerns.

There was also evidence supporting the potential-harm finding. Delissa continued to test positive for drugs throughout the case. Although she entered inpatient drug treatment multiple times, she failed to complete the treatment as ordered by the circuit court. She was referred to outpatient treatment after leaving the inpatient program but never attended. There was testimony that MC wanted to stop a visitation after he realized that Delissa was under the influence of drugs. Evidence of a parent's continued drug use or failure to comply with court orders constitutes sufficient evidence of potential harm. *Johnson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 313, at 11, 603 S.W.3d 630, 636.

As counsel notes, there was only one other ruling adverse to Delissa during the termination hearing. This occurred when DHS asked the caseworker whether, in her experience, there would be an effect on MC if the case were continued for an uncertain amount of time. Delissa's counsel objected on the basis of speculation. DHS responded that the caseworker had been working with the family and MC, and there were "large documented amounts of time and behaviors that have to do with MC and his reactions to the uncertainty of this whole process." The circuit court allowed the testimony, stating that Delissa's counsel would have the opportunity to cross-examine. The caseworker responded that she believed the uncertainty of what was happening with the case and what was going to happen to him would cause MC to regress and move back into the behaviors he exhibited at the beginning of the case instead of moving forward.

There could be no issue of arguable merit to raise on appeal of this evidentiary ruling. We will not reverse a circuit court's ruling on admissibility of evidence absent a manifest abuse of discretion. *Barton v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 239, at 12, 576 S.W.3d 59, 67. The testimony objected to was relevant to the issue of potential harm to MC if the case continued for an uncertain amount of time. There was testimony that MC's anger and behavioral issues stemmed from the uncertainty and instability in his life at the beginning of the case, which improved with counseling and being in a stable placement. The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Ross v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 503, at 16, 529 S.W.3d 692, 702. Potential harm must be viewed in broad terms, including the harm the child suffers from

15

the lack of stability in a permanent home. *Id.* "Potential" necessarily means that the answer looks to future possibilities, and potential harm was required to be considered. *Id.*

Even if it was erroneous, a mere showing that the circuit court erroneously admitted evidence will not support a reversal absent a showing of prejudice. *Rauls v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 366, at 10. Without any showing of prejudice, any judicial error as to the admissibility of evidence is harmless error and cannot be grounds for disturbing a circuit court's order. *Id.* Because there was other evidence of potential harm regarding Delissa's continued substance abuse and lack of compliance with the case plan, any error in the admission of this testimony was harmless.

Having reviewed the record on appeal and the brief presented to us, we conclude that counsel has complied with the requirements established by the Arkansas Supreme Court for no-merit appeals and agree that the appeal is wholly without merit. Accordingly, we affirm the termination order and grant counsel's motion to withdraw.

## II. *David's Merit Brief*

David's only argument on appeal is that the evidence is insufficient to support any of the grounds for termination.[3] In regard to the subsequent-factors ground, he contends that DHS was required to show that meaningful efforts were made to rehabilitate him. As for failure to remedy (noncustodial parent), he contends that DHS was required to show that

---

[3]Because David does not challenge the circuit court's best-interest determination, it is waived on appeal. *Debiasse v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 331, at 9, 651 S.W.3d 736, 743.

16

appropriate family services were offered. David's argument as to both of these grounds focuses entirely on the issue of services.

While David argues that he challenged the lack of services at the termination hearing, he acknowledges that the circuit court made previous reasonable-efforts findings. He did not appeal those findings in prior orders but states that this should not bar him from making this argument on appeal, contending that the findings could have applied only to Delissa because DHS did not offer him services. *See Peterson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 75, at 11, 595 S.W.3d 38, 44–45 (holding that appellant waived any services argument on appeal where he failed to challenge any of the circuit court's prior reasonable-efforts findings and to request any of the specific services that he claimed on appeal were necessary to remedy the cause of removal even though appellant may have raised a services argument at the termination hearing). With respect to his argument that he should not be barred because the reasonable-efforts findings only applied to Delissa, he cites no authority in support of his argument.

In *Cheney v. Arkansas Department of Human Services*, 2012 Ark. App. 209, 396 S.W.3d 272, the father argued that DHS did not make meaningful and reasonable efforts to rehabilitate him because he was not offered services while he was in prison. DHS and the attorney ad litem argued on appeal that the father waived this argument due to his failure to appeal from either the permanency-planning order or the fifteen-month-review order in which reasonable-efforts findings were made by the circuit court. *Cheney*, 2012 Ark. App. 209, at 11, 396 S.W.3d at 278. We noted that the permanency-planning order, which was

not appealed, provided that the father would be allowed visitation with the children only by letter or mail while incarcerated. *Id.* We held that because the father failed to challenge the reasonable-efforts finding in the permanency-planning order, he had waived the issue for purposes of appeal. *Id.*

Because David failed to appeal the previous reasonable-efforts findings, his argument is not preserved. Even if it were preserved, it would still fail. David does not address any specific service that DHS could or should have provided to him while he was incarcerated. *Cheney, supra*; *Yarbrough v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 429, at 9, 501 S.W.3d 839, 844.

David further suggests that even if this court holds that he is barred from challenging the previous reasonable-efforts findings, there was a four-month period between the last hearing in which the circuit court made such a finding and the termination hearing. He argues that, as a result, DHS was still required to offer services because it was not relieved of providing reunification services. Again, David cites no authority in support of his argument.

The subsequent-factors ground requires only that DHS offer appropriate family services. DHS contends that David was able to participate in staffings and that visitation would have been offered, but MC was unwilling to visit with David while he was incarcerated. David cites the definition of family services, which is "relevant services provided to a juvenile or his or her family" in order to achieve reunification or implement a plan of adoption or guardianship. Ark. Code Ann. § 9-27-303(24)(A) (Supp. 2023). He states that DHS, with the approval of the circuit court, was the "authority" on identifying what services

he would need to complete in order to have MC placed in his care. He contends that DHS never informed him of what services he should complete while incarcerated and if the services he completed in the years prior to the case opening would meet the requirement of the case plan. DHS cites the portion of the definition of "reasonable efforts" to involve an incarcerated parent, which provides:

> (v)(a) "Reasonable efforts" include efforts to involve an incarcerated parent.
>
> (b) The department shall:
>
> (1) Involve an incarcerated parent in case planning;
>
> (2) Monitor compliance with services offered by the Division of Correction to the extent permitted by federal law; and
>
> (3) Offer visitation in accordance with the policies of the Division of Correction if visitation is appropriate and in the best interest of the child.

Ark. Code Ann. § 9-27-303(49)(A)(v). Here, DHS was aware of the services that David completed while incarcerated; inquired about his release date and the therapeutic program he was required to complete before release; allowed him to attend staffings; and attempted to schedule visitation.

This court has affirmed terminations based on the subsequent-factors ground where the appellant argued the circuit court erred because no services were offered. *See Earls v. Ark. Dep't of Hum. Servs.*, 2018 Ark. 159, at 11–12, 544 S.W.3d 543, 549–50 (noting that the record demonstrated that Earls did not request services from DHS and that, because of his incarceration, there were no services that DHS could offer); *see also Cheney*, *supra*. Because David failed to challenge the prior reasonable-efforts findings and makes no suggestion of

what services DHS could have provided to him while incarcerated, we conclude that his argument is without merit. Accordingly, we affirm the termination as to David.

Affirmed; motion to withdraw granted.

VIRDEN and BROWN, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant David Miller.

*Dusti Standridge*, for separate appellant Delissa Johnson.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.